[No. D027985. Fourth Dist., Div. One. May 28, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LEROY MOBLEY, Defendant and Appellant.

## COUNSEL

Mark D. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez and Nancy L. Palmieri, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, J.**—In this opinion, we determine the trial court does not have a sua sponte duty to instruct the jury on the definition of "developmental disability" for convictions under Penal Code[1] sections 288a, subdivision (g) and 286, subdivision (g), respectively.

Robert Leroy Mobley was convicted by a jury of 17 counts of unlawful sodomy committed upon 2 young men in their early 20's who "because of a mental disorder or developmental or physical disability" were incapable of giving legal consent for such acts. (§ 286, subd. (g).) The jury found Mobley not guilty of unlawful oral copulation of one of the young men.[2] (§ 288a, subd. (g).) After a bifurcated court trial, Mobley was found to have previously suffered two out-of-state convictions that qualified as "strikes" under the three strikes law (§ 667, subds. (b)-(i)) and also constituted serious felony convictions within the meaning of section 667, subdivision (a)(1). The court sentenced Mobley to a total prison term of 435 years to life.

Mobley appeals, raising claims of instructional error, insufficiency of the evidence to support his convictions and the truth of one of his out-of-state priors, error in the admission of his postinvocation statements and the ineffective assistance of counsel at the bifurcated trial on the prior convictions. We affirm.

### FACTUAL BACKGROUND

██ Because Mobley challenges the sufficiency of the evidence to support his convictions, we have viewed the facts adduced at trial in full and in the light most favorable to the judgment, drawing all inferences in support of

---

[1]All statutory references are to the Penal Code unless otherwise specified.

[2]The court granted the prosecutor's motion to dismiss two counts of unlawful oral copulation alleged against the other young man.

the judgment. (*People* v. *Silva* (1988) 45 Cal.3d 604, 625 [247 Cal.Rptr. 573, 754 P.2d 1070]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Such evidence reveals that during the years between 1993 and 1996 Mobley befriended two developmentally delayed young men who were best friends and gradually committed various sexual acts with each over a period of time. It was uncontested the alleged acts of sodomy and oral copulation occurred. The major issue for the jury to resolve was whether the two young men, because of their disabilities, were capable of giving legal consent to the sexual acts Mobley committed upon them. The prosecution presented a case largely geared toward revealing the functioning mental state of the two victims.

Victim Stephen B.'s (Steve)[3] brother and mother testified extensively regarding his mental functioning. His brother Derek J., who was 14 years old at the time of trial, testified his relationship with Steve was not typical, as he was the person in charge of making decisions and supervising Steve, who was 10 years older than he, when their parents were not at home. Steve had very specific daily routines he followed. For example, on Mondays Steve got up, took a shower, played video games and at 2:30 or 3:00 p.m. watched *Mighty Max* on television. On Wednesdays, Steve would go to Mobley's place for the day, return home about 4:00 or 4:30 p.m., eat dinner with the family, watch television and go to bed. During the spring of 1996, Steve worked on Thursday and Friday mornings, leaving home at 7:40 a.m. and returning around 11:00 or 11:30 a.m. If he were going anywhere besides work those days, he was required to inform his family so they would know where he was. He watched cartoons and played Nintendo video games at the same time almost every day. Steve would become very agitated, scratching his hair and messing it up, if his routine were varied in some way. He was not violent at such times, only frustrated and confused.

Derek explained that while Steve dressed himself, he had difficulty understanding what was appropriate to wear for different weather conditions. If it was cold, he would have to be told to put on a jacket. When the weather warmed up, he had to be told to remove the jacket or he would sit with the jacket on, drenched in sweat. Steve could use the microwave oven and he helped with washing dishes and feeding the dog. He rode a bicycle and had learned to use public transportation. Although Steve read well, Derek did not know whether he understood what he read. Whenever he wanted to learn to get somewhere, Steve would bring the bus schedule to Derek so he could help plan the itinerary.

Derek could not recall exactly when he first met Mobley, but estimated it was several years before the trial. He did not think Mobley knew how to

---

[3]To protect the victims and their families, we refer only to the first initial of their last names.

hold a conversation, found he talked funny and thought it strange Mobley was older and still played Nintendo and rode a bicycle. Mobley had once made Derek uncomfortable when he tried to give him some pornographic videotapes during one of his visits to Steve. Derek also found it odd that Mobley's roommate, whom he met twice, was a transvestite named Helen Anderson. Although he was suspicious of Mobley, Derek did not mention anything about his concerns to Steve or his parents.

Derek estimated Mobley visited their home over 40 times. Mobley also house-sat several times for their family when they went on camping trips. At the times Derek observed Mobley together with Steve, he never saw them hug or kiss. This was consistent with Steve's behavior at home, where he never hugged, kissed or touched family members.

Derek had never heard Steve mention the male sex organ until one day in April 1996, as they played Nintendo and talked in Steve's room, when Steve used the word "cave," telling Derek about an incident involving Mobley and Anderson. When Derek questioned Steve about what the word cave meant, Steve became agitated, stuttered and scratched his body and head. He told Derek cave meant "wiener in the butt." Derek inquired further, asking whether Mobley had ever done the cave with Steve when he went over to his place. Steve said, "Yes," and became very nervous and uncomfortable. Their conversation was interrupted when Derek's father picked him up for visitation.

When Derek returned home the next morning, which was a Wednesday, he told their mother what he had learned from Steve about Mobley and the cave. They immediately went over to Steve's best friend's house to talk to him. Jonathon D. (Jon) was upset and frightened and began to cry as he told Derek and Steve's mother what had happened with him and Mobley. Jon accompanied Derek and his mother back to their house where they waited for Steve to come home. When he did so, his mother talked privately with him and Jon. The police later came to the house to investigate the matter.

Steve's mother, Nita T. (Mother), who worked part-time as an elementary school teacher, testified in more depth about Steve's background and disabilities. She exhaustively related Steve's gradual development after he came into her care at the age of four years, blind in one eye after much abuse and neglect.[4] His physical development was extremely slow and he was more like an infant than his chronological years. After evaluation of his developmental problems by Children's Hospital, Steve received regular care through the age of 12 years from therapists and physical, occupational and

---

[4]Steve did not know he was not Mother's natural child.

speech therapy. After several years Steve learned to chew and eat solid food. Between the ages of eight and ten, he learned to speak. He learned to tie his shoes when he was 10 or 11 years old, to dress and clean himself by age 12, and to wash dishes by age 14 or 15.

Although Steve's speech is now understandable, it is not always clear. He still runs much the same as a toddler runs with his body upright and rigid and his arms out straight to balance himself. He is able to do basic things which do not require eye-hand coordination and dexterity or more than one step. Because Steve is lateral-minded, each step of a series of instructions has to be given to him individually upon the completion of the previous step to finish a project. For instance, in order to have Steve pick up his clothes and put them away, Mother first has to tell him to pick the clothes up, then tell him to carry them to his room, then tell him to go into the room, and finally tell him to put the clothes in his drawer.

Mother testified Steve suffers from "Besti-Fuborg's Dysfunction," which she described as a serious processing disability that jumbles his perceptions. If someone touches him, Steve might perceive it as a threat or an electrical shock. This tactile defensiveness is a reason Steve does not readily touch others and does not like to be touched. Mother still works with Steve to try to accustom him to being touched.

In addition, Steve does not exhibit the ability to transfer information from one situation to another. He has a difficult time making choices. Mother opined Steve functions in a manner similar to that of the character played by Dustin Hoffman in the movie RAIN MAN (United Artists 1988). Hence, he lives on a schedule in a "robotic sort of way." He gets up at the same time and takes a shower at the same time each day. He sits and waits until the clock strikes the designated minute before doing a particular task. Any variation in his routine disrupts his ability to take care of himself. While he does not become violent when agitated by a change in circumstances, Steve paces, mutters, shakes, twists clothing or his hair, and raises his voice in frustration.

To be able to function, Steve requires a lot of rules. Because of his literal-mindedness, however, he often has trouble even applying the rules. For example, because he has been told not to talk with anyone outside their home, he often does not greet someone he has known for many years who greets him while walking in his own neighborhood. He also is not allowed to cook when home alone because if the instructions read to cook something on medium heat for five minutes, Steve will wait the full five minutes before removing the pan from the burner even if whatever is being cooked is burning or boiling over.

Although Steve reads well and may parrot information he has read or been given, and can explain what something means, Steve has difficulty applying that same information to real-life situations. He still believes in Santa Claus and the Easter Bunny and just ceased trick-or-treating on Halloween in 1995. For a long time, he believed cartoon characters were real and continues to see a child psychologist who is helping him learn to separate fact from fantasy.

After years of therapy, Mother enrolled Steve in the Regional Center at Children's Hospital for classes in independent living skills and also in special education programs provided by the public school system. Through programs at the Regional Center, Steve learned how to use a public restroom, to go to a restaurant, and also to go to a grocery store to make a purchase. He also mastered how to take a bus from point A to point B along a designated route. He is unable to drive because of his blindness in one eye and his inability to exercise abstract thought or independent judgment for unexpected situations.

Steve was in special school programs a total of 13 years and received a certificate of completion, although he technically did not graduate from high school. He met Jon when they were both six years old and attended classes for the developmentally disabled with him. Because they live near each other, Steve and Jon have remained good friends even though they see each other infrequently.

Mother believed Steve may have attended some basic sex education classes during the seventh grade. When he was younger, Mother explained to him the difference between "good" and "bad touches." She also told him about heterosexual sex, but never explained the mechanics of homosexual sex, telling him only that it consisted of two people of the same sex sharing a commitment to each other. To her knowledge, Steve had never been sexual with any of the girlfriends, also with disabilities, he had had and had never observed pornography or sexual conduct in his home. For many years, Steve would routinely draw pictures of girls two days a week and talk about when he was going to move out, have a wife and a home in the desert. He stopped this routine for almost a year and a half and started it again a few months before this trial.

Steve's main passion in life is trains. His room is filled with them and he talks about trains whenever he can. Through a special program at the Educational Cultural Complex for disabled people, Steve was able to get a job at the train museum in Balboa Park. The program coordinators arranged to pay the museum to let Steve work as a janitor there for six months. During

that time a shadow worker accompanied Steve and told him what to do. Because Steve loved the job, the museum's curator decided to keep him on for two hours each Thursday and Friday even though the funding for the project ran out. It was while working at the museum that Steve met Mobley.

Sometime in the fall of 1993, Steve came home and told Mother about a new friend at work named Bob (Mobley) with whom he had had lunch in the park. Steve thought Mobley was about 25 or 30 years old and a janitor at the train museum. On another occasion, Steve came home from work and asked if he could go to Mobley's apartment. Mother told him he could not visit Mobley at his home, but that Mobley could come visit at their house. When Mobley showed up, Mother was surprised to see he was older than Steve thought. Due to a speech impediment, Mother thought Mobley might be mildly retarded or socially delayed like Steve and allowed Steve to remain friends with him on condition he came to their house to visit, which he increasingly did.

After Mobley came over several times without invitation and entered the house without knocking, Mother allowed him to visit with Steve only once a week on Saturdays. On those days he would arrive at 9:00 a.m. and leave around 2:30 or 3:00 p.m. Mobley and Steve would play Nintendo, ride their bicycles and have lunch. Several times they rode over to Jon's house to visit with him. Mobley appeared to interact with Steve on his own level and was very tolerant of Steve's endless conversations on trains and other subjects in which he was interested.

From the first, Mother had explained to Mobley certain rules for visiting with Steve, telling him about Steve's disabilities and his inability to judge matters because of them. She told him Steve was very vulnerable and trusting and she wanted to be sure their friendship was appropriate. Mother also expressed her disapproval of Mobley buying Steve lunch or gifts or giving him medicine. After some months of regulated visits, Steve was allowed to go downtown on the bus and meet Mobley, ostensibly to watch airplanes and trains. Mother made clear to Mobley that Steve was not allowed to go to Mobley's room in the Pickwick Hotel where he lived with Anderson, whom Mother had heard about for months as Mobley's "girl-friend."

Mother was very surprised to meet Anderson, whom she had invited along with Mobley to the family's 1995 Thanksgiving dinner, and discover that Anderson is a transvestite. At that time Anderson appeared nervous and

afraid the family might send her[5] away. Rather, Mother and the family welcomed Anderson and invited her back with Mobley for Steve's birthday party that year on December 8th and at Christmas. After meeting Anderson and because of Mobley and Anderson's apparent relationship, Mother asked Steve if Mobley had ever done anything inappropriate with him. Steve said, "No." Anderson never disclosed to Mother that Steve had been visiting Mobley in their Pickwick Hotel room.

Mother learned about the sexual acts between Mobley and Steve from Derek. Her testimony tracked that of Derek's regarding the trip to Jon's house and returning to wait at home for Steve after a visit with Mobley. After she confronted both Steve and Jon about the cave and told them she was going to contact the police, Steve became very frightened and confused. Mother tried to explain to him that it was Mobley who was in trouble and not him, but he did not seem to understand.

Several police officers testified at trial regarding their investigation of the case. Officers who went to the house employed the same interviewing techniques that are normally used in questioning children when Steve and Jon were separately interviewed. Steve was fidgety and anxious during his interview. Afterwards, some officers drove to the Pickwick Hotel to find out if Mobley was in fact registered there.

Two days later, San Diego Police Sergeant Elsa Castillo was assigned to investigate the case. After individually interviewing Steve and Jon, Castillo prepared and executed a search warrant on Mobley's hotel room. Castillo and other officers seized magazines, trading cards, videotapes, a video camera and a jar of honey and almond skin cream from Mobley's room. The magazines were largely pornographic in nature. Most of the tapes were videotapes of movies, but one was pornographic and another revealed a small segment with Steve on it which had not been fully erased. Castillo subsequently arrested Mobley. While she and her partner were transporting him to jail, Mobley unsolicitedly announced he "liked boys" and had a sexual problem.

Jon's mother, Marilyn D., also testified at trial. She was unable to provide much in-depth background regarding Jon's functional status other than stating "he has problems in school like with figuring out things[.]" She said Steve was his only friend, he had gone through special education programs growing up, he liked toys and "Power Rangers" were his current favorite, he sometimes had pictures of pinup girls in his room, he did some chores

---

[5]Because Anderson was referred to as "Helen" throughout the trial and in the appellate briefing, we also use the feminine pronoun to refer to Anderson.

around the house, he could cook if supervised, he could take things apart and put them back together, he liked to read, he worked a night job stocking shelves in the Navy commissary, and he took public transportation to get to work. She said Jon was shy, had no girlfriends, had been told the difference between good and bad "touchings" when he was in school and probably knew what a homosexual was from television. Jon's mother was very religious and did not talk with Jon about sex at home. She also had strict rules for Jon.

Asked specifically about Mobley, Jon's mother said Jon met him through Steve when they rode their bicycles over to see Jon on Saturdays. She had seen Mobley with Steve and Jon every Saturday since sometime in 1995. The three would usually go to the park across the street from Jon's house and sit, talk and eat pizza. When Jon mentioned a few times that he was going to go to Mobley's place, his mother told him not to go inside.

Anderson, who met Mobley when she was homeless in Balboa Park and subsequently became his roommate at the Pickwick Hotel in late 1994, also testified in the prosecution case. Their room was small with a double-sized bed, several tables, an area Mobley had created to cook and keep food, a television set and a bathroom. Mobley also kept pornographic magazines and videotapes in the room. Although Anderson, who was actually a male but lived as a woman, and Mobley slept in the same bed, they did not engage in sexual relations—they were only good friends.

When Anderson moved in with Mobley, Steve would visit Mobley on Wednesdays "like clockwork," unless his bus was late, in what Anderson described as a repetitive ritual. Mobley had asked Anderson to leave the room for a few hours at the start of these visits so Mobley and Steve could have some privacy. So at 9:30 a.m. when Steve arrived, Anderson left and did not return to the room until about 11:30 a.m., when Mobley and Steve would then leave and go to the railroad station and the Burger King to eat. Steve would become upset if this ritual were not kept.

Sometimes after Steve visited Mobley, Anderson observed that pornographic magazines and videos had been used during the visit. Several times she also noticed that Mobley had video equipment set up and directed at the bed to take pictures of Steve. Mobley had told her Steve was his boyfriend and that he engaged in sexual relations with him on the Wednesday visits. Mobley had also told her that Steve's mother had told him Steve had the mental age of a seven-year-old and received disability payments. Anderson told Mobley he should stop having sex with Steve, but Mobley said he could not do so because Steve would get upset. Mobley warned Anderson not to

mention anything to Steve's mother about the sexual nature of his relationship with Steve when she accompanied Mobley to Steve's house for Thanksgiving dinner.

The times Anderson had observed Mobley with Steve in the room, they were watching television or playing Nintendo. Steve seemed much younger than his age. He liked to watch cartoons, liked model trains, and was incapable of having an adult conversation. Although Anderson had seen Mobley kiss Steve on the check as he was leaving to go home on three different occasions, she never saw Steve kiss or touch Mobley. Steve appeared to like and want to be with Mobley very much.

Anderson remembered Steve's friend Jon came to fix Mobley's VCR about four times. Jon, like, Steve, appeared to be mentally slow. Jon stopped visiting Mobley because his mother "want[ed] Jon at home on her own time" and Mobley declined to pursue the relationship further.

The two victims each then testified. After telling about how he and Mobley met and became friends, Steve testified about Mobley explaining to him that friends kiss, go to bed together and engage in sex. Mobley also told him about the cave, explaining what it meant and that "it was cool" and "would feel good." On his birthday in 1993,[6] Mobley took Steve on a train trip to Del Mar and afterwards told him he wanted to do the cave. When they got to Mobley's room, Mobley told him to take off his clothes, lie on the bed, and do as directed. Mobley then took off his own clothes, lay on the bed and got "ready to do the cave," which consisted of applying lotion to Steve's "butt" and his own "weiner." Mobley then inserted "his weiner, up [Steve's] butt." Mobley moved "back and forth" for "just 10 minutes" until some "sperm" or "white stuff" came out. Afterwards, Mobley told Steve not to tell anyone what they had done.

It was several months before Mobley asked Steve to again do the cave, telling him such conduct was how friends express their friendship. Steve did not like doing it at first, saying it did not feel too great and it was painful. When he told Mobley it hurt him and that he did not want to do it, Mobley told him "just do it." One time he threatened Steve that if he did not do it, he would not be able to leave the room. Other times, he would lie on top of Steve and just "rammed it in." Steve said the cave was only painful a short time and then it would be done. He just got used to it and "cooperated." Mobley never used a condom when he demanded the cave from Steve.

---

. [6]Mother was recalled as a witness to establish the date of the train trip was December 8, 1993, Steve's 21st birthday.

Mobley had told him that Anderson did the cave with him almost every night.[7]

The cave then became part of the ritual in visiting Mobley on Wednesdays.[8] Sometimes Mobley requested other sexual acts, like directing Steve to kiss him on the lips, to "touch his weiner" to "get it big," to touch his "balls" and to "put his mouth on [his weiner]." Mobley told Steve that men who are friends do these things. Mobley showed him some videos with naked men doing the cave and used his video camera one time to record Steve doing the cave.

On cross-examination, Steve answered, "Yeah," when asked whether it was correct that he did his job well, was independent, could think for himself, could make his own decisions, could handle money, could buy things from stores, could buy beer, could vote and could choose his friends. Steve also agreed his mother was overly protective, that he would find ways around her rules and that he had feelings of love for Mobley. When Mobley started requesting the cave, Steve "sort of" wanted to do it. When asked whether he was "the type of person that if someone tells you to do something that you just automatically do it," Steve answered, "Yep." When asked whether he would think about things before doing them, he replied, "Just think about it." With the question phrased as "didn't you" agree to have sex with Mobley freely and voluntarily, Steve answered, "Yep."

On redirect, Steve stated it was Mobley who told and taught him that two men can have sex together. It was also Mobley who always initiated the cave with him and he did the cave for friendship.

Jon then testified he first met Mobley at Steve's birthday party in December 1994. Afterwards, Mobley and Steve would sometimes ride over to his house on bicycles to visit on Saturdays. Mobley talked with Jon about electronics and VCR's. At some point, Jon visited Mobley at the Pickwick Hotel. Over the course of a year he thought he visited Mobley there about 10 times. During these visits Jon would play video games and talk with Mobley about VCR's. On one visit while Jon was playing a video game, Mobley put on a pornographic movie showing a man and woman having sex and told Jon he wanted to "suck [his] dick." Jon was uncomfortable and ignored Mobley's statement. On his next visit, Mobley again made the same statement and Jon again ignored it.

---

[7]At the time of trial, Steve was still uncertain whether Anderson was a man or a woman.

[8]Steve was recalled to testify at the conclusion of the case to verify the dates of his visits to Mobley's room through acknowledging his signature in the records from the Pickwick Hotel which required visitors to sign in. For a period of about 16 months, Steve visited the hotel 50 times, of which 38 times were on a Wednesday.

Later, during a visit in October 1995, Mobley again made the statement and asked Jon to lie down on the bed. This time Jon did so. Mobley then took his clothes off, began masturbating, lay down on the bed next to Jon, and told him to pull his pants down. When Jon did so, Mobley put his hand on Jon's penis and started moving it up and down, telling Jon to do the same to his. Jon was confused, tried to move his hand away, but then did as Mobley requested. Mobley then leaned forward and "sucked [Jon's] private part" with his mouth. After about five minutes, Mobley stopped, got on top of Jon, moving up and down with "his private part on [Jon's,]" and tried to kiss him on the mouth and stick his tongue in his mouth. Jon closed his mouth and jaw. Mobley told Jon he was fantasizing about him and asked him to turn over on his stomach. Although he was scared, Jon turned over. Mobley applied lotion from a shelf above the bed to Jon's "rear" and "put his penis on [Jon's] butt." Mobley then forced his penis into Jon's "rear," moving it "up and down." This hurt Jon and he told Mobley to stop several times. Jon tried to get up, but Mobley's body was too heavy for him to do so. Mobley kept going until "white substance came out of his penis." After Mobley cleaned Jon off with a towel, Jon went into the bathroom and saw that he was bleeding from his "behind." After putting his pants back on, Jon returned to the room where Mobley had dressed and fixed hot dogs for their lunch.

The next day, Jon told his sister, who is also developmentally delayed, about what happened and told her not to tell anyone. Jon did not think anyone would believe him and that his parents would get angry. Mobley had told him that the Bible said it was good to receive sexual pleasure and that he had done the same things with other young men and they enjoyed it. Although Jon visited with Mobley several other times, no further sexual conduct occurred.

On cross-examination, Jon, like Steve, answered in the affirmative questions asked to show his independent living skills, i.e., he could take public transportation, hold a job, make his own friends, vote, had a right to make choices, et cetera. He also acknowledged he had had some sex education in school, knew the meaning of some sexual terms, and that people of the same sex could be lovers. Jon stated, however, he was confused and had mixed feelings when Mobley showed him pornographic videos and asked him to do sexual things. Jon did not know whether it was right to stay or go at those times. He agreed he voluntarily did the acts with Mobley because "[he] was told."

Finally, Dr. Steven Sparta, a highly qualified psychologist who acts as the chief psychologist at Children's Hospital, testified in the prosecution's case.

He had conducted separate evaluations of Steve and Jon on June 18, 1996. Sparta conducted clinical interviews, obtained a history, reviewed past medical records and administered a series of standardized psychological tests to help him evaluate their mental facilities. Sparta explained that although neither Steve nor Jon was technically mentally retarded because each had tested above 70 on the portions of the Wechsler Adult Intelligence Test he administered, such was not a true indicator of their ability to think and reason without consideration of their "adaptive behavior" or social living skills.

As to Steve, testing revealed his verbal IQ is 80 on the Wechsler test and an 80 on the Peabody Picture Vocabulary IQ test. Such scores place him at the ninth percentile of cognitive functioning compared to other people his age, making him significantly delayed intellectually. Sparta opined Steve "is developmentally delayed by virtue of his functioning," which is "significantly different and atypical" for that of young adults his age. Such delayed intellect is not a function of learning or Steve's ability to learn, but his inability to apply what he has learned. Although there is some correlation between adaptive behavior and IQ, a low IQ does not necessarily mean an individual would do poorly on adaptive behavior and the converse is equally true. Steve's score on the Peabody test placed him at the cognitive functioning of a 14-year-old. Such score was consistent with past assessments of Steve's mental age.

Taking the test scores together with Steve's childlike presentation, his concrete, simplistic manner of understanding and answering questions during the interview, his history of special education and reported delays in his developmental functions and language, Sparta considered Steve "very atypical in his ability to think and reason and to act rationally, particularly as compared to another young adult at his chronological age." Sparta opined Steve's "ability to reason was that of a child much younger than 14 years of age," that he is developmentally delayed, meaning that "he is a borderline intelligence, and that he has mixed developmental disabilities [that] include language, reasoning and academic functioning." Sparta thought that Steve would have "much more limited ability" to make choices because of his disabilities. Because Steve generally takes in information literally, Steve appeared incapable of taking information and applying it to different situations. Sparta felt that Steve could recognize his options best in a nonthreatening situation where he was given sufficient information about what he was being asked in language that he understood.

In response to a series of hypothetical questions, Sparta opined that even if Steve were given information about sexually transmitted diseases, it would

be very difficult for him to apply such information to his everyday life. Because Steve had had no sexual experience before meeting Mobley, if placed in a threatening or coercive environment and subjected to homosexual advances, in Sparta's opinion Steve would have "a very difficult time in knowing how to react or how to judge that kind of situation." Steve had told Sparta he was "surprised" and "scared" when Mobley approached him in a sexual manner. From this discussion, Sparta thought Steve was confused, frightened and at a loss as how to react to such situations. Sparta concluded that Steve's "reasoning would limit his ability to make informed choices."

Regarding Jon, Sparta's testing revealed "his overall cognitive and developmental function was in the borderline range of ability." Jon obtained a score of 75 on the Wechsler IQ test and a 70 on the Peabody test, which is equal to the second percentile and equivalent to a mental age of 11 years 10 months. These scores were corroborated by a report and Jon's educational history. Jon had less communicative ability than Steve and an impaired general fund of information. He exhibited feelings of confusion during the questioning by Sparta. Sparta opined that Jon, like Steve, if presented with homosexual advances in a threatening environment would have difficulty recognizing his options in making a choice in that situation. It was Sparta's conclusion that Jon "is significantly delayed in his overall cognitive functioning."

On redirect, Sparta explained the difference between "assent" and "informed consent" as the latter requiring a person to agree to do something "with enough information about what they are being asked to do" and that they do it without threat or coercion after it has been explained to them at a level they understand.

The defense case consisted of the testimony of Dr. Thomas Barnes, a clinical psychologist, who reviewed and criticized Sparta's evaluations of Steve and Jon. Barnes, who did not interview either of them, did not agree with Sparta's conclusions or methodology in determining the young men's mental abilities. Barnes defined the term "developmentally disabled" as a precise psychological and legal term that referred strictly to a person who scored 69 or lower on the Wechsler IQ tests and replaced the term "mental retardation." The term "developmentally delayed" was not the same, but rather a misused catch-all term with no fixed content. He felt a parent was a biased person from whom to take a history of either young man. Barnes was of the opinion that because Sparta had failed to administer the Wechsler performance subtests in addition to its verbal subtests, his testing of any overall computation of intellectual functioning by Steve or Jon was incomplete.

Barnes testified it is impossible for a person with an IQ of 80 to 82 to be considered developmentally disabled. Based on one study he had read, he opined that people within a certain range of developmental disability could consent to sex. He knew of no difference medically between "assent" and "consent" such as noted by Sparta and concluded even people like Steve and Jon, with low and borderline intelligence respectively, could consent to sex. Barnes conceded that a person can have a developmental disability in a nontechnical, "lay sense" without being diagnosed as developmentally disabled.

Before the matter went to the jury, the parties stipulated that the Pickwick Hotel was in San Diego County and Mobley had been arrested without incident on April 19, 1996.

DISCUSSION

I

*Capacity to Consent*

Although Mobley raises several additional issues on appeal, his major claims regarding the sufficiency of the evidence and a sua sponte jury instruction concern the capacity of the two victims to consent to the sexual acts performed on them by Mobley. As originally charged, Mobley faced allegations he had committed acts of unlawful sodomy pursuant to section 286, subdivision (g), and unlawful oral copulation pursuant to section 288a, subdivision (g). Each respectively charged count provided that the described sexual act be performed with "[another person] who at the time was incapable, because of mental disorder or developmental or physical disability, of giving legal consent to said act, and said defendant knew and reasonably should have known of such condition, in violation of" that section. (See §§ 286, subd. (g), 288a, subd. (g).) At several junctures during the trial, the court made rulings as a matter of law that subdivision (g) of each section did not require a victim be diagnosed as "developmentally disabled" in order for the matter to go to the jury on the issue of capacity to consent.

In denying Mobley's motion for dismissal at the conclusion of the evidence on grounds there was insufficient evidence of a "mental disorder, developmental disability, or a physical disability," the court stated: "I don't believe the statute as it was written requires a person to be categorized psychologically as developmentally disabled for that statute to be applicable. [¶] And I am interpreting developmental disability as having a broader range in interpretation than just mental retardation/I.Q. [¶] And that is based on the

expert testimony, as well as just a general interpretation of—well, the expert testimony. That's just an interpretation of the statute as it reads and the instructions that go along with it. [¶] I am looking at those incapacity statutes to be read in light with the consent definition as we did in the instructions. [¶] So in light of that, your motion is denied. And I think it's real clear that there is no evidence before the court to prove that the two men are developmentally disabled. [¶] So, I'm real comfortable saying that that has not been proven as far as being psychologically diagnosed as developmentally disabled." The court thought a clear interpretation of the statute with regard to such mental capacity would be a good appellate issue.

Later, after the prosecutor had presented her closing argument and before defense counsel presented his, he wanted the record to reflect that he had requested a jury instruction "that the term 'developmental disability' refers to a person who has an I.Q. of 69 or less." The court sustained the prosecutor's objection to such instruction, stating it did not believe such was an accurate statement of the law.

From this record, Mobley has framed two contentions on appeal. First, acknowledging that the instruction on "developmental disability" offered at the time of trial was inaccurate, Mobley claims the trial court had a sua sponte duty to instruct on the technical medical-legal definition of that term. Secondly, he claims there was insufficient evidence of incapacity of either victim to give legal consent. As we explain below, we conclude there was no sua sponte duty to instruct on the definition of developmental disability in this case, and there is sufficient evidence in the record to support Mobley's convictions.

## A. *Instruction on Developmental Disability*

■ The general rule is that in a criminal case the trial court must instruct on the "principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' [Citation.]" (*People v. Saddler* (1979) 24 Cal.3d 671, 681 [156 Cal.Rptr. 871, 597 P.2d 130].) With this preliminary rule in mind, we address Mobley's claim the trial court prejudicially erred when it failed to instruct sua sponte on the definition of developmental disability.

■ In instructing on the elements of the charged crimes, the court read to the jury CALJIC No. 10.22 (1992 rev.) (Unlawful Sodomy With Person

Lacking Capacity),[9] CALJIC No. 10.11 (1993 rev.) (Unlawful Oral Copulation With Person Lacking Capacity),[10] and CALJIC No. 1.23.1 (1995 rev.) (Consent—Defined in Rape, Sodomy, Unlawful Penetration and Oral Copulation).[11] In essence these instructions told the jury that in order to convict Mobley of such crimes it had to find that at the time the respective acts of sodomy and oral copulation with Steve and Jon were committed, that each victim was incapable of understanding the nature of the act committed upon him in order to give free and voluntary consent because of "a mental disorder or developmental or physical disability" and that Mobley knew or reasonably knew about such incapacities. Mobley does not challenge the given instructions as erroneous. Rather, he claims the trial court was also required sua sponte to define for the jury the term "developmental disability," which he argues is the only mental status under which the victims Steve and Jon could have fallen since there was no evidence either had mental

---

[9]CALJIC No. 10.22 as read to the jury provided: "The defendant is accused in [count[s] 1-16, 20 of] the information of having committed the crime of unlawful sodomy in violation of Section 286[, subdivisions] (g)(h) of the Penal Code. [¶] Every person who engages in an act of sodomy with any person and such other person is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this incapacity is known or reasonably should be known to such person, is guilty of the crime of unlawful sodomy in violation of Section 286[, subdivisions] (g)(h) of the Penal Code. [¶] In order to prove such crime, each of the following elements must be proved: [¶] (1) A person engaged in an act of sodomy with another person; [¶] (2) Such other person was at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent; and [¶] (3) This incapacity was known, or reasonably should have been known to such person. [¶] Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy. Proof of ejaculation is not required."

[10]CALJIC No. 10.11 as read to the jury provided: "The defendant is accused in count 19 of the information of having committed the crime of unlawful oral copulation, a violation of section 288a[, subdivision] (g) of the Penal Code. [¶] Every person who engages in an act of oral copulation with any person and such other person is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this incapacity is known or reasonably should be known to such person, is guilty of the crime of unlawful oral copulation in violation of section 288a[, subdivision] (g) of the Penal Code. [¶] In order to prove such crime, each of the following elements must be proved: [¶] (1) A person engaged in an act [of] oral copulation with another person, and [¶] (2) Such other person was at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and [¶] (3) This capacity was known or reasonably should have been known to such person. [¶] Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person. Any contact, however slight, between the mouth of one person and the sexual organ or anus of another person constitutes 'oral copulation.' [¶] Penetration of the mouth, sexual organ or anus is not required. Proof of ejaculation is not required."

[11]CALJIC No. 1.23.1 as read to the jury provided: "In prosecutions under Penal Code Sections 288 and 286, the word 'consent' means positive cooperation in act or attitude as an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." The court's written instruction did not include the specific section numbers.

disorders or physical disabilities which would preclude them from being able to give legal consent. He further posits that the legal-medical definition of developmental disability in Welfare and Institutions Code section 4512, subdivision (a),[12] is the proper definition for a developmental disability which could affect the capacity of these victims to give legal consent in a section 286, subdivision (g) or section 288a, subdivision (g) conviction.[13] We agree with the trial court, that Mobley's interpretation is a hypertechnical reading of what is required for a conviction under these statutes. We believe a fair and proper construction of such statutes reveals no technical legal or medical diagnosis of developmental disability is necessary for a conviction. Consequently, we hold such definition of that term is not required sua sponte under the statutes in question.

█ It is well established that fundamental rules of statutory construction require us "to ascertain the intent of the lawmakers so as to effectuate the purpose of the [statute]. [Citations.]" (*People* v. *Pieters* (1991) 52 Cal.3d 894; 898 [276 Cal.Rptr. 918, 802 P.2d 420].) In doing so, we must examine the language of the statute and "accord words their usual, ordinary, and common sense meaning based on the language the Legislature used and the evident purpose for which the statute was adopted." (*In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789].) "[W]e presume the Legislature did not intend absurd results." (*In re Head* (1986) 42 Cal.3d 223, 232 [228 Cal.Rptr. 184, 721 P.2d 65].) Where a statute may be interpreted more than one way, we will adopt the meaning that is reasonable and reject the one that would lead to an unjust and absurd result. (*People* v. *Clark* (1990) 50 Cal.3d 583, 605 [268 Cal.Rptr. 399, 789 P.2d 127].) Where the

---

[12]Developmental disability as formulated in subdivision (a) of Welfare and Institutions Code section 4512, means: "a disability which originates before an individual attains age 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals, but shall not include other handicapping conditions that are solely physical in nature." This subdivision was recently amended to substitute "for individuals with mental retardation" in place of "for mentally retarded individuals" in the last sentence. (Stats. 1998, ch. 1043, § 1.)

[13]Mobley also extends his argument on appeal to include the premise that the court must further instruct on the definition of "mental retardation" when it gives the technical statutory definition of "developmental disability" because such is related in a matter of degree and is the "touchstone" of this case. As noted above, a trial court need only instruct the jury sua sponte with those principles of law related to the case. (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) As all parties agreed at trial, neither of the victims was mentally retarded. Therefore, there was no evidence to support the reading of an instruction on such mental condition. Mobley's revival of this issue after the trial court noted such was "not in the range of the evidence" during defense counsel's posing of a hypothetical to his expert is specious.

language of the statute is unambiguous, it " 'should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' [Citations.]" (*People* v. *Pieters, supra,* 52 Cal.3d at pp. 898-899.) "Thus, '[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.]" (*Id.* at p. 899.)

■ Further, in construing any particular provision of a statute, we do not insert words into it as such would "violate the cardinal rule that courts may not add provisions to a statute. [Citations.]" (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 827 [4 Cal.Rptr.2d 615, 823 P.2d 1216].) Nor are we permitted to rewrite the statute to conform to an assumed intent that does not appear from its plain language. (*Napa Valley Wine Train, Inc.* v. *Public Utilities Com.* (1990) 50 Cal.3d 370, 381 [267 Cal.Rptr. 569, 787 P.2d 976].) "[U]nless context or evident meaning require a different construction, a qualifying clause is ordinarily to be applied to the words or phrases immediately preceding it and not to others more remote. [Citations.]" (*People* v. *Foley* (1985) 170 Cal.App.3d 1039, 1052 [216 Cal.Rptr. 865].) We presume the Legislature in amending a law "is deemed to be aware of statutes and judicial decisions already in effect and to have enacted the new [version] in light thereof." (*People* v. *Hernandez* (1988) 46 Cal.3d 194, 201 [249 Cal.Rptr. 850, 757 P.2d 1013], disapproved on another point in *People* v. *King* (1993) 5 Cal.4th 59, 78, fn. 5 [19 Cal.Rptr.2d 233, 851 P.2d 27].) "[W]e do not construe statutes [or their subdivisions] in isolation, but rather read every statute [and subdivision] 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" (*People* v. *Pieters, supra,* 52 Cal.3d at p. 899.)

■ With these rules in mind, we consider the parts of the statutes in question. Subdivision (g) of both sections 286 and 288a specifically states that: "Except as provided in subdivision (h),[14] a person who commits an act of [sodomy] [oral copulation], and the victim is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act, shall be punished by imprisonment in the state prison for three, six, or eight years. Notwithstanding the existence of a conservatorship pursuant to the [provisions of the] Lanterman-Petris-Short Act (Part 1 (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code), the prosecuting attorney shall prove, as an element of

---

[14]Subdivision (h) of each respective section proscribes the designated sexual act with a person confined in a state hospital who is incapable of giving legal consent to such act, regardless of the existence of a Lanterman-Petris-Short Act (LPS) conservatorship. (§§ 286, subd. (h), 288a, subd. (h).)

the crime, that a mental disorder or developmental or physical disability rendered the alleged victim incapable of giving consent." (See respectively §§ 286, subd. (g), 288a, subd. (g).)

By its plain language, the second sentence of subdivision (g) of each section requires that in order to obtain a conviction it must be proven "that a mental disorder or developmental or physical disability rendered the alleged victim incapable of giving consent." (§§ 286, subd. (g), 288a, subd. (g).) The words of each subdivision also explain that the fact the victim has been placed under an LPS conservatorship[15] is not sufficient to describe the status or condition which renders a victim "incapable of giving legal consent" at the time of the defined unlawful act, either sodomy or oral copulation. (*Ibid.*)

The statutory schemes of which these subdivisions (g) are a part originally defined conduct that was criminal even between consenting adults. (See §§ 286, 288a; *Bowers* v. *Hardwick* (1986) 478 U.S. 186 [106 S.Ct. 2841, 92 L.Ed.2d 140]; *People* v. *Catelli* (1991) 227 Cal.App.3d 1434, 1452-1454 [278 Cal.Rptr. 452] (conc. and dis. opn. of Carr, Acting P. J.).) In 1975, our Legislature decriminalized acts of sodomy and oral copulation which are performed between consenting adults, except in certain situations. (Stats. 1975, ch. 71, §§ 7 & 10, pp. 133, 134.) Since that time, the status of the participants, i.e., minors or prisoners, or the use of force by a sexual aggressor, has been important in determining whether the described acts are unlawful. (See §§ 286, 288a; *People* v. *Catelli, supra,* 227 Cal.App.3d at p. 1454; 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Decency and Morals, §§ 783-784, pp. 882-886.)

In 1977, subdivision (f) was added to sections 286 and 288a to proscribe acts of sodomy and oral copulation where "the victim is at the time unconscious of the nature of the act and this is known to the person committing the act . . . ." (Stats. 1977, ch. 490, §§ 1, 2, p. 1614.)[16] In 1981, subdivision (g) was added to sections 286 and 288a respectively to proscribe acts of sodomy

---

[15]An LPS conservatorship generally requires a finding that a person is "gravely disabled as a result of mental disorder or impairment by chronic alcoholism." (Welf. & Inst. Code, § 5350.)

[16]It appears that subdivision (f) of section 286 was used before the enactment of subdivision (g) to prosecute a defendant who committed sodomy on a victim who did not understand the nature of the act in which he participated because of his mental retardation. (*People* v. *Howard* (1981) 117 Cal.App.3d 53, 55 [172 Cal.Rptr. 539].)

Subdivisions (f) of sections 286 and 288a were amended in 1993 to add a specific definition for "unconscious of the nature of the act" for a conviction under that subdivision. (Stats. 1993, ch. 595, §§ 4, 5.) Such now requires the victim be "incapable of resisting because [he] meets one of the following conditions: [¶] (1) Was unconscious or asleep. [¶] (2) Was not aware, knowing, perceiving, or cognizant that the act occurred. [¶] . . . Was not

and oral copulation with a victim who "is at the time incapable, *through lunacy or other unsoundness of mind, whether temporary or permanent*, of giving legal consent. . . ." (Stats. 1981, ch. 896, §§ 1, 2, p. 3415, italics added.) In 1983, the Legislature amended subdivision (g) in each section to replace the above italicized language with "because of mental disease, defect, or disorder or because of physical disability" and added the second sentence regarding the LPS. (Stats. 1983, ch. 949, §§ 2, 3, pp. 3417, 3418.) Subdivision (g) of sections 286 and 288a was amended to its present wording in 1985, at the same time subdivision (h) was added. (Stats. 1985, ch. 1085, §§ 2, 5, pp. 3631-3632, 3633.)

Nothing in the current language of subdivision (g) of sections 286 and/or 288a, or their respective legislative histories, suggests the phrase "because of mental disorder or developmental or physical disability," when read as explaining the status or condition of the class of persons "incapable of giving legal consent" which those subdivisions describe, to have special or peculiar imports different from their ordinary, generally understood meanings. We believe such phrase, since 1985, is commonly understood to refer to physical or mental disorders or disabilities, or a combination thereof, which would render a person without the capacity at the time the alleged crimes are committed to "legally consent" to such acts. Whether a victim has such incapacity is a question of fact for the trier of fact, which is clearly explained in the combination of standard CALJIC instructions which have been drafted to present such issue to the jury, and that were given in this case. (See *ante*, pp. 782-783, fns. 10-12.)

That a technically diagnosed medical or legal definition of "developmental disability" was not intended by the Legislature can be gleaned from the various changes in the wording of the questioned phrase in the subdivisions (g) of sections 286 and 288a and the inclusion of the second sentence which identifies the incapacity to consent as an element of each crime, yet clarifies that the proof of an LPS conservatorship is not sufficient to show such condition. In other words, medical diagnosis which is required for an LPS conservatorship to prove a mental disorder or developmental disability sufficient for finding a person "gravely disabled" under that statutory confinement scheme is not sufficient, by itself, to find the incapacity to consent under subdivision (g) of sections 286 and 288a. (See Welf. & Inst. Code, §§ 5350, 5352.)

Subdivisions (g) of the sections 286 and 288a were adopted to provide protection to a certain class of victims, those who are "at the time incapable,

---

aware, knowing, perceiving, or cognizant of the essential characteristics of the act due to the perpetrator's fraud in fact." (§§ 286, subd. (f), 288a, subd. (f).)

because of mental disorder or developmental or physical disability, of giving legal consent," from people who know or reasonably should know of such condition when they commit acts of sodomy or oral copulation with such protected victims. The Legislature's amendments to those subdivisions evidences a continuing compelling need to provide protection to an ever-increasing category of persons who may be considered victims due to their diminished or lesser physical and mental capacities which make them unable to render "legal consent." Mobley's interpretation that a specific legal or medical definition of developmental disability is required sua sponte in such cases would necessarily narrow such intended scope of protection.

Further, to make his arguments, Mobley has selectively taken apart the words of such phrase in each subdivision, isolating the terms "developmental" and "disability" from the remainder of the phrase and the subdivision of which it is a part. He reads "developmental disability" in a vacuum, ignoring the fact that the phrase in its totality is a qualifying clause for the incapacity to give legal consent which is the crux of finding the acts of sodomy or oral copulation unlawful under section 286, subdivision (g) and section 288a, subdivision (g). Although we have not found this exact phrase, "because of mental disorder or developmental or physical disability," construed in other statutes or cases, the term "developmental disability" has been used, as noted by Mobley, by the courts and Legislature when referring to the specific legal or medical finding necessary to find a defendant incompetent to stand trial, to find an actual mental disability for a civil commitment and to qualify for state benefits for a specifically defined mental condition. (See § 1370.1, subd. (a)(1) [now § 1370.1, subd. (a)(1)(H)];[17] Welf &. Inst. Code, §§ 4512, subd. (a), 5350, 5352.) While we are aware that "[w]here the language of a statute uses terms that have been judicially construed, ' "the presumption is almost irresistible" ' that the terms have been used ' "in the precise and technical sense which [have] been placed upon them by the courts" ' [and t]his principle [also] applies to legislation" (*People* v. *Weidert* (1985) 39 Cal.3d 836, 845-846 [218 Cal.Rptr. 57, 705 P.2d 380]), we do not believe such presumption applies where the terms, as in this case, are not used in similar situations.

In addition, when the respective subdivisions (g) were added to sections 286 and 288a, the Legislature was aware of the legal-medical definitions it had earlier added to the Penal and Welfare and Institutions Codes. (§ 1370.1, subd. (a)(1); Welf. & Inst. Code, § 4512, subd. (a).) That the Legislature did not include such specific definition in subdivision (g) of sections 286 and

---

[17]Section 1370.1, subdivision (a)(1) was rewritten in 1996. (Stats. 1996, ch. 1026, § 2; Stats. 1996, ch. 1076, § 2.5.) Such subdivision provides essentially the same definition as that given in the Welfare and Institutions Code.

288a when enacted or subsequently amended reflects it did not intend to limit the words in the phrase in question describing the class of protected persons to such technical medical or legal definitions. We thus believe, consistent with their commonsense usage and the evident purpose for which they were enacted, the Legislature used the phrase "because of mental disorder or developmental or physical disability" with the general meaning in mind to include a category of people who do not possess sufficient mental or physical capacity due to a broad spectrum of disabling conditions to make an intelligent choice to consent to the sexual act proposed by another.

Although this class or status of victims may certainly include a person who is technically "developmentally disabled," it is not limited to such a person. Moreover, such condition or specific medical or legal label is not by itself an element of the offenses defined in sections 286 and 288a. Rather, the gravamen of such element, and consequently the offenses, is that the victim suffers from some mental or physical disorder or disability that renders the victim incapable of giving informed consent at the time the acts of sodomy or oral copulation are committed. As noted, the instructions given the jury here fully explained this factual question it had to resolve.

In light of the above, we disagree with Mobley's specific assertion the trial court was required in this case to sua sponte instruct the jury with the definition of developmental disability in Welfare and Institutions Code section 4512, subdivision (a). To the extent such definition may help the jury in any particular case, it is more properly a pinpoint instruction which requires a request. (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588].) No instructional error is shown.

## B. *Sufficiency of the Evidence*

■ We resolve a sufficiency of the evidence challenge based upon the entire record and determine whether there is substantial direct or circumstantial evidence of the convicted offenses. (*People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253]; *People* v. *Johnson, supra,* 26 Cal.3d at p. 577.) The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusion. (*People* v. *Arcega* (1982) 32 Cal.3d 504, 518 [186 Cal.Rptr. 94, 651 P.2d 338].)

In making our determination, we do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. (Evid. Code, § 312.) We simply consider whether " ' "*any* rational trier of fact could have found the

essential elements of [Mobley's crimes] beyond a reasonable doubt." ' [Citations.]" (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960], original italics.) Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the [jury's] verdict[s,]" we will not reverse. (*People* v. *Hicks* (1982) 128 Cal.App.3d 423, 429 [180 Cal.Rptr. 391].)

■ Mobley's sufficiency of the evidence claim concerns only the element of incapacity to consent by his victims. The acts of sodomy are conceded. The evidence at trial as to whether Steve or Jon had the mental capacity to give legal consent was conflicting. The prosecution expert Dr. Sparta testified as to the things the jury must find for either young man to understand and give "consent" rather than "assent" for the acts. He found both men to be "developmentally delayed" to the point that they would have difficulty applying what they learned and in making choices because of their disabilities. As neither young man had had sexual experiences before meeting Mobley, Sparta opined both would have trouble making choices if presented with homosexual advances in a threatening environment. Mobley's expert disagreed with Sparta's assessment of the capacity of the victims to legally consent.

In addition to the conflicting expert testimony on the issue, the jury also had heard evidence of Steve's and Jon's mental impairments from Steve's and Jon's mothers and Steve's brother. Steve's mother had specifically advised Mobley of Steve's vulnerability because of his disabilities. Mobley's roommate further assessed each victim as being "slow" mentally and apprised the jury of the fact Mobley had told him Steve's mental capacity was like that of a seven-year-old and that he was receiving disability benefits. More importantly, the jury heard the full testimonies of Steve and Jon. While the cold appellate record reflects that on cross-examination each agreed he had voluntarily committed the various acts of sodomy, the direct testimony of each shows otherwise.

To the extent Mobley's sufficiency of the evidence argument is premised upon the assumption that a technical diagnosis of developmental disability as medically defined had to be shown for his convictions, such is faulty as we have already determined. Mobley's other attacks on the evidence are nothing more than challenges to the credibility of the various witnesses' testimonies. He asks us to reweigh the evidence, which we cannot do. It is for the trier of fact to assess the relative strengths or weaknesses of any witness's testimony in light of its uncertainties.

After hearing all the evidence, observing all the witnesses and their demeanor, listening to closing arguments where all the discrepancies were

discussed, and after being fully instructed on the law,[18] the jury chose to believe the People's version of the facts and not those Mobley would have had them believe. Mobley fails to appreciate the credibility of all the witnesses, including his expert's, was also before the jury. The jury could have reasonably inferred from the prosecution evidence, including Steve's and Jon's direct testimonies, that Steve and Jon did not have the capacity to give legal consent at the time the acts of sodomy were committed and that Mobley knew or reasonably should have known of such incapacities. Sufficient evidence supports the convictions.

## II

### Postinvocation Statements

*In limine*, the prosecutor advised the court Mobley had made spontaneous statements after his arrest about liking boys and having a sexual disorder. Defense counsel requested an evidentiary hearing regarding the admissibility of such statements. At that hearing, Castillo testified about advising Mobley of his *Miranda*[19] rights and his refusal to talk with her by stating "he wanted to see an attorney." Castillo, who was the case agent, did not ask Mobley anything further, consistent with her training. About an hour later, her partner Officer Julian Rico and she transported Mobley to the county jail. During the ride, Mobley made unsolicited spontaneous statements "that he had a similar sexual problem before, that he liked boys. He also said that he had been at Atascadero. . . . He said he tried to get help there for his problem, but he was not able to get any help."

On cross-examination, Castillo acknowledged Rico was not present when she read Mobley his rights. She had, however, informed him that Mobley had invoked and would have taken some action if she had heard any questioning by Rico. She remembered Rico talking with Mobley in a conversational manner and that he was present when Mobley made his statements. She also recalled Mobley made the statements when they were getting close to the jail and he also mentioned he wanted to kill himself. Castillo could not remember whether the conversation between Rico and Mobley happened before or after Mobley's statements.

---

[18]In addition to being instructed fully on the crimes charged, the jury was also instructed on the credibility of witnesses (CALJIC No. 2.20), on discrepancies in testimony (CALJIC No. 2.21.1), on weighing discrepancies and conflicts in the testimony (CALJIC Nos. 2.21.2 and 2.22) and on the burden of the prosecutor to prove beyond a reasonable doubt every element of the crimes charged (CALJIC No. 2.90).

[19]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

Rico then testified. He had assisted Castillo in the search of Mobley's room before assisting her with transporting Mobley to jail. When Rico got into the car, he did not know the content of Castillo's interview with Mobley. Because this was not his case, he did not question Mobley about it. Although Rico could not remember what he may have said to Mobley, he usually engaged only in small talk "to lighten things up" while helping with the transport of a suspect. At some point during the ride, without any prompting, Mobley mentioned he had been in Atascadero and that he had a problem with liking boys.

Defense counsel argued that if the court got past the fact that neither officer could remember the conversation between Rico and Mobley after he had invoked, Mobley's purported spontaneous statements were irrelevant because they described an earlier problem, not a current one, and even if they had some probative value, such was outweighed by their prejudicial value. The prosecutor conceded the fact Mobley had been hospitalized before was not relevant, but argued the statements regarding a sexual problem and liking boys were highly relevant on the issue of Mobley's knowledge of the victims' disabilities which equated them with children, an element necessary to prove the charged crimes.

The court ruled the statements were spontaneous and relevant, noting it would not allow any reference to Atascadero State Prison mental hospital, but would allow the statements indicating a preference for boys. The court stated it had done a balancing under Evidence Code section 352 and found the prejudicial effect of such statements was minimal compared to the probative value.

On appeal, Mobley contends the statements he made during transport were elicited by Rico in violation of his *Miranda* rights and should have been excluded. He also asserts the court abused its discretion in finding the statements relevant and more probative than prejudicial. We address each claim in turn.

A. *Purported Miranda violation*

The governing law is well settled. Once a suspect has invoked his rights under *Miranda* to have an attorney present during custodial interrogation, he is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police." (*Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [101 S.Ct. 1880, 1885,

68 L.Ed.2d 378].) Spontaneous statements are not the product of interrogation and therefore are not violative of *Miranda*. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 648 [286 Cal.Rptr. 801, 818 P.2d 84].)

In *Rhode Island* v. *Innis* (1980) 446 U.S. 291 [100 S.Ct. 1682, 64 L.Ed.2d 297], the United States Supreme Court clarified that *Miranda* rights only come into play when a suspect in custody is subjected to either express questioning or its "functional equivalent," i.e., by words or actions on the part of police that they should know are "reasonably likely to elicit an incriminating response." (*Id.* at p. 303 [100 S.Ct. at p. 1691].) California courts have characterized this definition as a two-pronged inquiry: 1) was the officer's remark or action the type reasonably likely to elicit an incriminating response; and 2) even if the officer did not intend to elicit such response, should that officer have known the action or remark was likely to do so? (*People* v. *O'Sullivan* (1990) 217 Cal.App.3d 237, 241-242 [265 Cal.Rptr. 784]; *People* v. *Claxton* (1982) 129 Cal.App.3d 638, 653-654 [181 Cal.Rptr. 281].)

■ By finding Mobley's statement's spontaneous, the trial court impliedly rejected his counsel's suggestion "interrogation" by Rico elicited such statements, thereby constituting a *Miranda* violation. Our de novo review of the uncontested facts reveals the trial court's ruling was proper. (See *People* v. *Vargas* (1993) 13 Cal.App.4th 1653, 1660 [17 Cal.Rptr.2d 445].) Rico's attempt at casual conversation with Mobley during transport to the jail was neither direct interrogation nor its functional equivalent that was likely to elicit an incriminating response. Mobley has not presented any competent evidence, either below or on appeal, to show his statements were in response to any of Rico's comments or that Rico should have known his casual remarks would have encouraged Mobley to make incriminating statements. (See *People* v. *Ashford* (1968) 265 Cal.App.2d 673, 685 [71 Cal.Rptr. 619].) We find, as the trial court did, that Mobley's statements made in light of this record were thus spontaneous.

## B. *Relevancy and Evidence Code Section 352*

■ Mobley also contends the trial court abused its discretion in admitting such statements because they were irrelevant and more prejudicial than probative. We disagree.

■ Generally, a trial court has wide discretion in determining the admissibility of evidence (*People* v. *Lucas* (1995) 12 Cal.4th 415, 449 [48

Cal.Rptr.2d 525, 907 P.2d 373]), i.e., in deciding whether the evidence is relevant (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468], disapproved on other grounds in *People* v. *Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99]) and whether Evidence Code section 352 precludes its admission (*People* v. *Lucas, supra,* 12 Cal.4th at p. 449). The trial court's ruling in exercising such discretion will not be disturbed on appeal absent an abuse of discretion. (*Ibid.*)

Here, the court accepted the prosecutor's argument that the evidence was relevant on the issue of Mobley's knowledge, which was an element of the charged crimes. Although the court thought his statements regarding his past mental confinements for sexual problems were not relevant, it thought Mobley's sexual preference for boys was and that his statements about such preference were admissable. Because "[e]vidence is relevant when no matter how weak it may be, it tends to prove [an] issue before the jury[, and t]he weight of such evidence is for the jury[,]" (*People* v. *Slocum* (1975) 52 Cal.App.3d 867, 891 [125 Cal.Rptr. 442]), we cannot find that the court abused its discretion in finding Mobley's unsolicited statements admissible as relevant. Clearly, such statements had a "tendency in reason to prove [a] disputed fact;" i.e., that Mobley knew Steve and Jon had mental disabilities making them childlike, similar to boys. (Evid. Code, § 210.)

Moreover, on this record, which reflects the court understood and performed its duty to weigh the possibility of prejudice against the probative value of Mobley's pretrial statements, we cannot say the trial court failed to properly weigh such factors. (*People* v. *Williams* (1997) 16 Cal.4th 153, 213-214 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Under these circumstances, we conclude there was no abuse of discretion in the trial court's ruling that Mobley's spontaneous statements he had a sexual problem and liked boys were admissible. In any event, we cannot perceive of any prejudice caused by the admission of such statements since the evidence against Mobley was abundant, the statements were not sensationalized either at the time they were adduced as evidence through Castillo's testimony or during closing arguments, and the jury was cautioned as to their limited use as admissions. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Contrary to Mobley's arguments on appeal that such statements were in essence improperly admitted other sex crimes evidence and evidence to encourage "homophobia," the record reflects Mobley did not raise such arguments below and the court carefully limited the admission of such statements to the element of knowledge, admitting no evidence regarding Mobley's prior hospital or prison commitments or his convictions due to

sexual misconduct with minors or mentally incompetent persons. No prejudicial error is shown.

### III

### *Truth of Out-of-State Prior*

 Mobley raises three separate issues regarding the truth of one of his out-of-state priors. First, he contends his conviction for attempted sodomy in the State of Oregon is insufficient to constitute a serious felony for purposes of the three strikes law and an enhancement under section 667, subdivision (a)(1) because the element of "attempt" in Oregon is different than that required for an attempt under California law. Next, he claims the admission of the Oregon probation report, which contains hearsay statements concerning the facts of his attempted sodomy in that state, was improperly admitted and the admission of such statements violated the Sixth Amendment. Finally, he argues his trial counsel was incompetent for failing to object to the admission of such report. His related assertions have no merit.

 It is well established that foreign convictions can be used in California for sentencing purposes where they contain all of the elements required for a felony in this state. (*People* v. *Crowson* (1983) 33 Cal.3d 623, 633-635 [190 Cal.Rptr. 165, 660 P.2d 389]; *People* v. *Guerrero* (1988) 44 Cal.3d 343, 346-348 [243 Cal.Rptr. 688, 748 P.2d 1150]; *People* v. *Myers* (1993) 5 Cal.4th 1193, 1195 [22 Cal.Rptr.2d 911, 858 P.2d 301].) As we noted in *People* v. *Purata* (1996) 42 Cal.App.4th 489 [49 Cal.Rptr.2d 664]: "Under the current version of the 'least adjudicated elements' test, the trier of fact may consider the entire record of the proceedings leading to the prior conviction to determine whether the prior offense 'involved conduct which satisfies all of the elements of the comparable California serious felony offense.' [Citation.] If not precluded by the rules of evidence or other statutory limitations, the trier of fact may go beyond the least adjudicated elements of the offense and consider evidence found within the entire record of the foreign conviction. [Citation.]" (*People* v. *Purata, supra,* 42 Cal.App.4th at p. 493.)

 Here, the trial court was presented and admitted as evidence without objection certified documents showing that in case No. C 83-04-31765 in the State of Oregon, County of Multnomah, Mobley was charged with and pled guilty on July 25, 1983, to the crime of attempted sodomy in the first degree. The certified "petition to enter plea of guilty"

contained Mobley's statement that he was pleading guilty on the basis of the operative facts that "between 3/1/83 [and] 4/13/83 in [Multnomah County] I attempted to have oral-genital contact [with] a person under 12 [years] old." The certified presentence report filed in connection with the case for sentencing purposes reveals in an "official version" of the facts taken from the police reports, that during interviews subsequent to his arrest: "Mobley informed officers that [the seven-year-old victim Sammy] had skipped school. [They] went to Sammy's apartment, and he committed oral sodomy on the youngster and had the child 'kiss' his penis. He went on to explain that he laid on top of the boy and attempted to insert his erect penis into the boy's anus. [Mobley] stated that this was uncomfortable for Sammy and he did not want to hurt him. The defendant explained that he climaxed and ejaculated on the boy's buttocks." Under the "defendant's version" of the facts in the probation report, the probation officer noted that "[t]he defendant agrees with the official version."

After reviewing these documents, hearing evidence from a fingerprint expert who identified Mobley's fingerprints in certified prison packets from Oregon as the same as those taken during booking in this case, and argument that there was insufficient evidence of constitutional waivers or that this prior was separately brought and tried from the other prior matter, the court found true the Oregon attempted sodomy conviction was a serious felony prior for strike and enhancement purposes. The court specifically found the appropriate constitutional waivers were found in the documents submitted and that such also revealed the matters had been separately brought and tried even though the sentences for each were served concurrently.

On appeal, Mobley concedes that sodomy in the first degree in Oregon constitutes the crime of lewd and lascivious acts on a child under age 14 in California (§ 288, subd. (a)), which in turn is both a violent and a serious felony for strike and enhancement purposes. (§§ 667.5, subd. (c)(6), 1192.7, subd. (c)(6).) He also acknowledges that an attempt to commit a serious felony is also a serious felony in California. (§ 1192.7, subd. (c).) However, because Oregon only requires that there be a "substantial step" toward the commission of the crime attempted in addition to the specific intent to commit such crime rather than a "direct act" of the attempted crime as required in California, he argues his statement in the plea form that he attempted to have oral-genital contact with a person under 12 years old is insufficient to support the true finding that his Oregon attempted sodomy conviction is a serious felony in California. Mobley asserts that the only way the trial court could have found his Oregon attempted sodomy conviction to be a serious felony would have been by reviewing the statements in the presentence report in that case. He claims such report is neither a part of the

"record of conviction" nor cognizable evidence as it contains inadmissible hearsay. He recognizes the court in *People* v. *Monreal* (1997) 52 Cal.App.4th 670 [60 Cal.Rptr.2d 737] has determined such issues against him. Nevertheless, to the extent we follow *Monreal* to find the probation report is part of the record of conviction and that his statements to the police and the probation officers contained in that report were "admissions" properly received as evidence, Mobley argues he was denied his Sixth Amendment right to counsel as to those statements and his trial counsel in this case was ineffective for failing to lodge an objection to the admission of the entire report.

We have read and considered *Monreal* and find its reasoning and holdings dispositive of Mobley's claims. (*People* v. *Monreal, supra,* 52 Cal.App.4th at pp. 674-680.) Mobley's statements made to the police officers at the time of his arrest and during interviews pursuant to that arrest were admissions that fall within the hearsay exception for party admissions. (Evid. Code, § 1220; see *People* v. *Garcia* (1989) 216 Cal.App.3d 233, 237 [264 Cal.Rptr. 662].) His statement to the probation officer was an adopted admission of his previous admissions to the police and also falls within an exception to the hearsay rule. (Evid. Code, § 1221; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1232 [283 Cal.Rptr. 144, 812 P.2d 163], quoting *Bourjaily* v. *United States* (1987) 483 U.S. 171, 183-184 [107 S.Ct. 2775, 2782-2783, 97 L.Ed.2d 144].) "Since the probation report of defendant's [adopted] admissions to the probation officer qualifies both as part of the record of conviction and as admissible hearsay, defense counsel was not ineffective in stipulating to its admissibility." (*People* v. *Monreal, supra,* 52 Cal.App.4th at p. 680.)

Moreover, Mobley's claim the use of his statements in the probation report constitutes a violation of his Sixth Amendment procedural safeguards of representation of counsel is in essence another way of complaining he was not advised of his right against self-incrimination before making his various admissions to the probation officer. We believe this issue has been fully discussed in *Monreal* and find the rejection of such claim dispositive here. (*People* v. *Monreal, supra,* 52 Cal.App.4th at pp. 680-682.)

Because Mobley's challenges to the sufficiency of the evidence to support the court's true finding on his Oregon attempted sodomy conviction were based only on legal issues we have resolved against him, we conclude the trial court properly found such out-of-state prior constituted a strike and a serious felony within the meaning of section 667, subdivision (a)(1).

## DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and Benke, J., concurred.

A petition for a rehearing was denied June 15, 1999, and appellant's petition for review by the Supreme Court was denied September 1, 1999. Mosk, J., was of the opinion that the petition should be granted.