Filed 6/29/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C074871 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF124524) |
| v. | |
| THOMAS MICHAEL VUKODINOVICH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, Stephen L. Mock, Judge. Affirmed.

Linda M. Leavitt, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III, IV, and V of the Discussion.

1

Statistics show that 1 percent of the U.S. population have developmental disabilities.  (Reed, *Criminal Law and the Capacity of Mentally Retarded Persons* (1997) 83 Va. L.Rev. 799, 801.)  Given this percentage, there has been a "movement toward the normalization and mainstreaming of . . . individuals [with developmental disabilities]" in our society.  (*Id*. at p. 799.)  "Greater integration into society has created opportunities in education, vocational training, and recreational activities."  (*Ibid*.)  It has "also led to more opportunities to develop consensual intimate relationships that are often positive. While opportunities for consensual relationships have increased, the sexual exploitation and abuse of [individuals with developmental disabilities] continues to be a major problem."  (*Ibid*.)

Penal laws in California help address this problem by making it a felony to engage in, among other things, sexual intercourse, oral copulation, and digital penetration with a person who "is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent."[1]  (Pen. Code,[2] § 261, subd. (a)(1) [sexual intercourse]; § 288a, subd. (g) [oral copulation]; § 289, subd. (b) [penetration by a foreign object].)  "This is true even if the victim purports to consent."  (*People v. Thompson* (2006) 142 Cal.App.4th 1426, 1429.)  These penal laws are at issue in this case.

Here, defendant Thomas Michael Vukodinovich was the 73-year-old bus driver for Yolo Employment Services, a nonprofit agency providing work activity programs, job training, and job retention for individuals with disabilities, who was entrusted with taking clients to and from work.  L. was a 49-year-old female client of Yolo Employment

---

[1]     Legal consent in these contexts is defined as "positive cooperation in act or attitude pursuant to an exercise of free will.  The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved."  (Pen. Code, § 261.6.)

[2]     All further section references are to the Penal Code unless otherwise indicated.

Services with a mental age of three or four and an IQ of 37 who rode defendant's bus. From 2009 through 2012, defendant and L. carried on a sexual relationship, mostly in the bus consisting of sexual intercourse, oral copulation, and digital penetration. The sex acts usually took place when all the other passengers were off the bus, except sometimes the sex acts occurred while a gentleman who could not speak and another gentleman who was often asleep remained on the bus. Defendant told L. to "be quiet" about the sex acts and not to tell anybody because defendant "not wanna fire," meaning he did not want to be fired. Oftentimes, L. would say she did not want to engage in the sex acts, but defendant persisted. Defendant was prosecuted for the sex acts on the sole theory that L. was incapable of giving legal consent.

The jury found defendant guilty of one count of sexual intercourse, one count of attempted sexual intercourse, five counts of oral copulation, and four counts of digital penetration, all with a person who "is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent." (§ 261, subd. (a)(1) [sexual intercourse]; § 288a, subd. (g) [oral copulation]; § 289, subd. (b) [penetration by a foreign object].) The court sentenced defendant to 14 years in prison.

In the published portion of this opinion, we reject defendant's contentions that these penal laws impinge on his and L.'s rights to privacy and there was insufficient evidence of a lack of legal consent to support these convictions. In the unpublished portion of this opinion, we reject defendant's other contentions.

FACTUAL AND PROCEDURAL BACKGROUND

A

*The Prosecution's Case*

L. has been a client of Yolo Employment Services since she was 18 years old. L.'s job, Monday through Friday from 8:30 a.m. to 2:00 p.m., through Yolo Employment Services, was as a warehouse worker for Walgreens, affixing labels to products.

3

L. could not drive or take public transportation. She lived with one of her sisters, who was her caretaker. L. was partially blind and could not read or write. She could not cook. She could bathe herself and change herself, but she did not consistently select clothes appropriate for the weather. While she had "feelings like any other woman," talking about "this boy cute" and had communicated in the past with her sister about sex in basic slang terms such as, "dick in the pussy," before the charged incidents she had never talked to her sister about other types of sex acts.

L.'s source of transportation to and from work was defendant and his bus through Yolo Employment Services. Defendant was L.'s bus driver from 2009 through August 2012. During rides home from L.'s work, defendant would direct L. to move up to the front seat, and then he would have her lie down on the floor and remove her clothes. Defendant would put "[p]inky, two hand" in her "gina." It felt "[n]ot good." Sometimes he kissed her breasts and "gina." Sometimes they engaged in sex acts while the bus was parked at a lake by L.'s house. She told defendant, "No more, Tom, no more, no more, stop." But defendant would push her to the floor and make her lick his "peanut" and put it in her mouth. L. "[n]o like it in [her] mouth, hurt." When she told defendant, "no more," defendant "[a]gain," "pushed [her] head down." The "green, green" came out of his penis.

The sex acts usually took place in the afternoons when defendant had dropped off most other clients at their houses. Sometimes remaining in the bus would be a gentleman who could see but could not talk and another gentleman who would usually be asleep. If that gentleman opened his eyes, defendant would stop any sexual activity with L. Defendant told L. to "be quiet" and not to tell anybody because defendant "not wanna fire," meaning he did not want to be fired. L. did not want defendant to be fired, so she "did quiet" and did not tell anybody.

4

Once, defendant told L. to sit on his lap while he was in the driver's seat, and he put "[h]is peanut" in her "gina." It felt "[n]ot good" and she said, "[S]top. Tom, I said stop." Defendant did not stop and said "go, go."

Another time, defendant drove L. to her house and came in. Defendant had to use the bathroom, and when he came out he kissed her and pulled her pants down. He then put his "peanut" in her "gina."

At trial, on redirect examination, when asked if she wanted to have sex with defendant, L. responded, "A little bit, not a lot." When asked why she wanted to have sex with defendant, she responded, "It's good." When asked whether she wanted defendant to put his finger in her vagina, L. responded, "Yeah, one, not two."

L.'s sister learned of the sex acts between L. and defendant in June 2012 when a family acquaintance reported seeing the bus parked over a dozen times and defendant and L. interacting in ways that seemed inappropriate (i.e., L. was standing over defendant with her arm around him; L. was rubbing defendant's shoulders; L. was in between the passengers' seats and the driver seat, and as the family acquaintance approached the bus, L. moved into a passenger's seat, all the while defendant remained seated in the driver's seat).

Defendant was interviewed twice by police. He admitted to the sexual acts with L., but said that the acts began when she became "aggressive" toward him. L. "started putting her hands down [his] pants" and after resisting for days, he "gave into it." He felt "trapped" by L. because he was afraid she would tell everybody what was happening if he said "no" to her advances. L. thought of defendant as her boyfriend and wanted to marry him. L. had conversations with defendant in which she talked about past sexual encounters and from those conversations, defendant thought that L. "apparently . . . enjoys sex and wants it from wherever she can get it."

L. was interviewed at the multidisciplinary interview center, where adults with developmental disabilities who are alleged sexual abuse victims are interviewed. L. said

5

"this man . . . Tom . . . touchin' my body . . . and there was . . . dick in my mouth." "I not want it. Uh, I was afraid." He put his penis in her "gina" and it felt "[i]n the funny." Defendant also made her hand touch his "[p]eanut." When asked what sex meant to her, she said, "The baby. Don't wanna a baby."

Dr. Phyllis Williamson was a clinical psychologist who performed a consultation with L. in 1991. Dr. Williamson was the one who assessed L.'s mental age at three or four with an IQ of 37. Someone like her would have a "very concrete, black and white" ability to understand the concept of sex. She would have names for body parts, would be able to say where babies come from, but could not weigh the "pros and cons" in terms of making a decision about whether to have sex. She could explain that a person could get "sick" from having sex, but she could not "really comprehend the consequence of having an STD." A person like this might want to engage in sexual activities because if she had sexual experiences, she is "going to recognize that as being a pleasurable experience."

B

*The Defense*

Sharon McKee, a supervisor at Yolo Employment Services, had known L. for 25 years. She considered L. to be her friend, and L. regularly visited McKee's house for a couple of days at a time, walking her dog, "hang[ing] out," going swimming, going to dinner, and going to the movies. L. had signed legal documents on her own relating to her placements and her Medicaid. McKee has known L. to be untruthful, and L. knows how to "figure out stories to keep herself out of trouble." They have talked about "private body parts," which L. referred to as "dick" and "pussy," and "things of a sexual nature." L. has talked to her about things of a sexual nature that she has asked McKee not to tell L.'s sisters. After defendant was arrested, L. told her that she and defendant

6

had had sex a lot of times,[3] he did not force her to do anything, she loved him, she wanted to marry him, and she was "terrified that her sisters would find out."

Another long-term employee of Yolo Employment Services, Alice Tapley, had known L. for almost three decades. She has also known L. to be untruthful, although the incidents of untruthfulness had tapered off in the last 10 years. In 2005, L. accused a bus driver of touching her and another client in a sexually inappropriate way. When the other client said it did not happen, L. admitted she was lying because she was mad at the bus driver and then said she was sorry.

## C

### *The Verdicts*

The jury found defendant guilty of 10 sex acts and one attempted sex act. The jury could not reach a verdict on 46 other charged sex acts (oral copulation and penetration by a foreign object), so the court dismissed those counts on the prosecutor's motion.

## DISCUSSION

Defendant appeals from the resulting judgment, contending: (1) the statutes criminalizing sexual acts with people incapable of consent due to a developmental disability are unconstitutional because they violate his and L.'s federal and state rights to privacy; (2) there was insufficient evidence that L. lacked legal capacity to consent to the sexual acts; (3) the trial court abused its discretion and violated his right to present a defense when it excluded some evidence of L.'s sexual history; (4) the cumulative effect of the errors prejudiced him; and (5) the trial court violated the prohibition against ex post facto laws when it imposed a $280 restitution fine. Disagreeing with these contentions, we affirm.

---

[3]     L. said the sex hurt because "there was so much of it." It was McKee's opinion that L. "wasn't used to having so much sex."

7

# I

*The Penal Code Sections Criminalizing Sexual Conduct With People*

*Incapable Of Consent Do Not Violate Defendant's Right To Privacy*

Defendant contends that the statutes criminalizing sexual conduct with people incapable of consent due to a developmental disability (§ 261, subd. (a)(1) [sexual intercourse]; § 288a, subd. (g) [oral copulation]; § 289, subd. (b) [penetration by a foreign object]) are unconstitutional because they violate his federal and state right to right to privacy.[4]

In support of his contention, he relies on *Lawrence v. Texas* (2003) 539 U.S. 558 [156 L.Ed.2d 508], in which the United States Supreme Court held the "[p]etitioners' criminal convictions for adult consensual sexual intimacy in the home," which consisted of sodomy, violated "their vital interests in liberty and privacy protected by the Due Process Clause of the Fourteenth Amendment." (*Lawrence*, at pp. 564, 578-579 [156 L.Ed.2d at pp. 516, 525-526].)

The United States Supreme Court, however, made clear its decision in *Lawrence* did not extend beyond protecting the private sexual conduct of two *consenting* adults: "The present case does not involve minors. *It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused.* It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, *with full and mutual consent from each other*, engaged in sexual practices common to a homosexual lifestyle. The

---

[4] To the extent defendant raises a violation of L.'s right to privacy, he lacks standing to do so. (See *People v. Badgett* (1995) 10 Cal.4th 330, 343 ["defendants must allege a violation of their *own* rights in order to have standing"].)

petitioners are entitled to respect for their private lives." (*Lawrence v. Texas*, *supra*, 539 U.S. at p. 578 [156 L.Ed.2d at p. 525], italics added.)

In fact, "[t]he principle that rape may be committed by having sex with a person so mentally incapacitated as to be incapable of consenting is hardly novel. 'Under English common law this situation was considered no different from intercourse with an unconscious person . . . .' [Citation.] In California law, the phrase 'incapable . . . of giving legal consent' dates back at least as far as the original Penal Code of 1872, which defined rape so as to include 'an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, . . . [¶] . . . [¶] [w]here she is incapable, through lunacy or other unsoundness of mind, whether temporary or permanent, of giving legal consent. . . .' " (*People v. Thompson*, *supra*, 142 Cal.App.4th at p. 1434.)

Were we to accept the alternative conclusion that defendant had a constitutional right to engage in sexual conduct with a person who had developmental disabilities and who lacked the legal capacity to consent, we would render the state incapable of protecting individuals with disabilities. "Obviously, it is the proper business of the state to stop sexual predators from taking advantage of developmentally disabled people." (*People v. Thompson*, *supra*, 142 Cal.App.4th at p. 1429.)

We therefore reject defendant's contention that the penal laws at issue here designed to protect individuals with developmental disabilities from sexual exploitation, when there is evidence that the victim lacked the legal ability to consent, violate his right to privacy.

II

*Substantial Evidence Supported The Jury's Finding*

*L. Lacked The Legal Capacity To Consent To Sexual Conduct*

Defendant contends his convictions must be reversed because there was insufficient evidence that L. lacked legal capacity to consent to the sexual conduct here.

We disagree and begin our analysis with a line of cases similar to ours where this issue has been raised and rejected.

As we have noted, legal consent as applied here is defined as "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.) Over a century ago, our Supreme Court explained that "[t]his degree of intelligence may exist with an impaired and weakened intellect, or it may not." (*People v. Griffin* (1897) 117 Cal. 583, 585.) Since then, a series of three cases has found sufficient evidence that the victims lacked legal capacity to consent in situations similar to ours.

First, in *People v. Boggs* (1930) 107 Cal.App. 492, this court upheld a defendant's conviction of rape where the victim had the mental capacity of a 10 or 12 year old and lacked " 'sufficient mentality to protect herself from the ordinary vicissitudes of life.' " (*Id*. at pp. 493-494.) The victim testified as follows in response to the question whether she resisted: " 'If I didn't let him do it he would just stand there and wouldn't let me get anything done and I didn't want him to stand there all day and not let me get anything done for I was busy and I told him I was busy and had work to do and that I didn't have time. . . . I didn't want him to stay there all day for I wouldn't get anything done.' " (*Id*. at p. 494.) While "[i]t [wa]s true that she seemed to know what constitutes the physical act [of intercourse] and that pregnancy might result therefrom, . . . she apparently had little conception of other serious consequences which would follow." (*Ibid*.)

Second, in *People v. Mobley* (1999) 72 Cal.App.4th 761, disapproved on other grounds in *People v. Trujillo* (2006) 40 Cal.4th 165, 181, footnote 3, the appellate court upheld a defendant's convictions of unlawful sodomy of two men in their early 20's. (*Mobley*, at p. 767.) Both victims had low IQ's (80 and 75), the cognitive functioning of adolescents (14 year old and 11 year old), and some basic sex education. (*Id*. at pp. 771, 773-774, 777-779.) One of the victims answered, " 'Yep,' " when asked if he "agree[d]

10

to have sex with [defendant] freely and voluntarily," and the other one "agreed he voluntarily did the acts with [defendant]." (*Id.* at pp. 776, 777.) "More importantly, [however], the jury heard the full testimonies [of the victims]," and the jury "could have reasonably inferred from the prosecution evidence, including [the victims'] direct testimonies, that [they] did not have the capacity to give legal consent at the time the acts of sodomy were committed." (*Id.* at pp. 789, 790.) This testimony included that the defendant had befriended both victims (who were best friends) and "explain[ed] to [one of the victims] that friends kiss, go to bed together and engage in sex." (*Id.* at p. 775.) "[Defendant] also told [that victim] about the cave [anal sex], explaining what it meant and that 'it was cool' and 'would feel good.' " (*Ibid.*) Defendant initiated the cave, directing one of the victims "to take off his clothes, lie on the bed, and do as directed." (*Ibid.*) He also told one of the victims not to tell. (*Ibid.*) Over time, one of the victims "just got used to it and 'cooperated.' " (*Ibid.*) The other victim testified, "he was confused and had mixed feelings when [the defendant] showed him pornographic videos and asked him to do sexual things. [This victim] did not know whether it was right to stay or go at those times. He agreed he voluntarily did the acts with [the defendant] because '[he] was told.' " (*Id.* at p. 777.)

And third, in *People v. Thompson*, *supra*, 142 Cal.App.4th at page 1426, the appellate court found substantial evidence that the victim was incapable of giving legal consent, where she "could not cook, use a bus, or do simple arithmetic. She was even more seriously disabled than the victims in *Mobley*, in that she could not hold down a real job, handle money, or cast an independent vote. She conversed at the level of a nine or 10 year old and read at the level of a seven or eight year old. Although she had attended high school, she, like the victim in *Boggs*, was not really qualified for a diploma." (*Thompson*, at p. 1436.) "Also like the victim in *Boggs*, [the victim] had some idea of what sexual intercourse was, including that it could result in pregnancy. However, her understanding was on the same level as the children's rhyme, 'First comes love, then

11

comes marriage, then comes a baby in a baby carriage.' She did not understand that sex could result in disease." (*Thompson*, at p. 1436.) It was also "relevant that [the] defendant was one of [the victim's] caretakers and that he exploited her vulnerability, the very type of harm the statute seeks to guard against." (*Id.* at p. 1440.)

Under the reasoning of these line of cases, we also find substantial evidence L. was incapable of giving legal consent during the charged sex acts with defendant. At the time the sex acts were committed, L. was effectively under the control of defendant, who had been entrusted to drive her to and from her job, something she could not do on her own. She had the mental age of three or four and an IQ of 37, putting her in the "moderately [disabled] category." She was partially blind. She could not read or write. She could bathe herself and change herself, but did not consistently select clothes appropriate for the weather. She could not cook. While she had "feelings like any other woman," talking about "this boy cute" and had communicated in the past with her sister about sex in basic slang terms such as, "dick in the pussy," before the charged incidents she had never talked to her sister about other types of sex acts. When L. and her sister would see sexual intercourse on television, L. would tell her sister, " 'that's bad,' " prompting her sister to change the channel because it was making L. uncomfortable. When asked by the interviewer at the multidisciplinary interview center what sex meant to her, L. said, "The baby. Don't wanna a baby." When asked at trial whether she knew she could "get sick" from having sex, L. responded "Yes," but then when asked "[w]hat can happen," she replied only, "Sick." While defendant points out that on redirect examination L. said she wanted to have sex with defendant, "[a] little bit, not a lot" and that she wanted sex because, "[i]t's good," these facts do not prove capacity to give legal consent. What appears to be consent from somebody who lacks capacity to consent is, in effect, nothing at all.

### III

*The Trial Court Did Not Err In Excluding*

*Some Evidence Of L.'s Sexual History*

Defendant contends the trial court abused its discretion and violated his right to present a defense when it excluded some evidence of L.'s sexual history. We disagree.

### A

*The Evidence Defendant Is Claiming On Appeal*

*Should Have Been Admitted*

The evidence defendant is claiming on appeal should have been allowed at trial was as follows:

In 1990, L. reported to her supervisor that her bus driver had fondled her private parts. The incident occurred when nobody else was on the bus and the driver took her to a secluded area with walnut trees near her house. She had not told anyone else because she was afraid and because the bus driver said she would no longer be able to ride the bus if she told. There was no evidence whether the 1990 incident was true or false.

In 1991 Dr. Williamson, who interviewed L., wrote a report about L. She wrote, among other things, that L. had been seen "masturbating herself and grabbing male members in a sexually intrusive manner" and "attempting to engage in sexual behavior with fellow workers."

In 2000, L. "was written up for telling several people in the shop to suck in the --"

In 2002, L. "asked male workers essentially to suck her pussy, pointed to her female parts, and asked another client to suck his dick using gestures."

The court did admit a 2005 incident in which L. accused a bus driver of touching her and another client in a sexually inappropriate way. When the other client said it did not happen, L. admitted she was lying because she was mad at the bus driver and then said she was sorry.

13

B

*Procedural Facts Relating To The*

*Admissibility Of L.'s Sexual History*

The issue of L.'s sexual history was first brought up by the People, who filed a written motion to exclude evidence of the incidents from 1990, 2000, and 2005, arguing it was irrelevant to the issue of whether L. could legally consent here. The court granted the motion.

Defendant then tried to have the report that Dr. Williamson wrote admitted to show the information an expert considered in evaluating L.'s "condition." The court excluded the information "under [section] 352" because it would "be difficult, if not impossible, for a juror listening to the testimony from this expert about what reports she relied on, reports that don't come from her firsthand knowledge, but from the facility's staff to go through the mental gymnastics of using that information only to assess the expert's ultimate opinion and not rely on that information . . . ."

Defendant then filed a written motion to have the sex acts from 1990 and 2005 admitted as relevant to L.'s credibility. The trial court excluded from evidence the 1990 incident because it was irrelevant, as there was no evidence whether the report was true of false. It ruled the 2005 incident was admissible as a specific instance of lying.

Defendant then made an offer of proof regarding what he would have elicited about L.'s sexual history, which included the following: In 2000, L. "was written up for telling several people in the shop to suck in the --." In 2002, L. "asked male workers essentially to suck her pussy, pointed to her female parts, and asked another client to suck his dick using gestures."

The court ruled the 2002 incident was never brought up by defendant in any of his motions and it was untimely to bring it up now. The court said nothing about the 2000 incident.

14

C

*The Trial Court Did Not Err In Excluding*

*Some Evidence Of L.'s Sexual History*

Defendant contends the court erred in excluding the evidence of L.'s sexual history from 1990, 2000, and 2002 because the evidence would have explained L.'s legal capacity to consent in that she knew about various sex acts and was an adult who "was interested in sex and enjoyed sex." We take each incident in turn.

As to the 1990 incident, it was not established whether the incident was true or false, so it had no probative value in terms of L.'s veracity or L.'s knowledge of sex acts through that alleged encounter. Therefore, the trial court correctly excluded it as irrelevant. (See Evid. Code, §§ 350 [only relevant evidence is admissible], 210 [relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].)

As to the 2000 incident, the court did not provide a specific ruling on it, and defendant's failure to obtain a ruling on that issue forfeits the issue on appeal. (*People v. Murphy* (1962) 207 Cal.App.2d 885, 888-890 [if court fails to rule upon issue raised by party, it is incumbent upon objecting party to seek ruling, otherwise issue is deemed forfeited].)[5]

As to the 2002 incident, the trial court ruled it was never brought up by defendant in any of his motions and it was untimely to bring it up now. Defendant offers no argument as to why this ruling was incorrect, even when brought to his attention by the People in their respondent's brief in a section entitled, "Waiver." As such, he has not

---

[5]     This could have been because L.'s alleged sexual conduct in this instance was not at all clear. Defendant's offer of proof stated rather vaguely as follows: In 2000, L. "was written up for telling several people in the shop to suck in the --."

15

carried his burden of persuading us that the trial court incorrectly held his motion as to the 2002 incident was untimely.

As to the incidents contained in the psychologist's 1991 report about L.'s sexual behavior that included masturbating herself and sexually aggressive behavior toward others, the trial court acted within its discretion in excluding from evidence this hearsay in the report the psychologist relied on in forming her opinions. "When expert opinion is offered, much must be left to the trial court's discretion." (*People v. Carpenter* (1997) 15 Cal.4th 312, 403.) "Although an expert may base an opinion on hearsay, the trial court may exclude from the expert's testimony 'any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.' " (*People v. Pollock* (2004) 32 Cal.4th 1153, 1172.) Here, the trial court acted within its discretion in preventing Dr. Williamson from testifying about the underlying incidents about which she had no personal knowledge because of the potential the jury might be confused by the fact that it could not rely on these acts for the truth of the matter.

Finally, we address defendant's argument that his Sixth Amendment right to present a defense was "impinged greatly upon" because of the exclusion of all of this evidence. The evidence excluded touched on two points -- credibility and L.'s sexual history. But evidence as to these points was already introduced, so the excluded evidence would not have created a significantly different impression of L. for the jury. (See *People v. Frye* (1998) 18 Cal.4th 894, 946 [there is no violation of the Sixth Amendment right to present a defense "unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility' "].)

For example, as to credibility, L.'s friend and a supervisor at Yolo Employment Services, Sharon McKee, testified that L. has been untruthful and knows how to "figure

16

out stories to keep herself out of trouble." Another long-term employee of Yolo Employment Services, Alice Tapley, also had known L. to be untruthful, and related a story that L. had made up in 2005 about a bus driver touching her and another client in a sexually inappropriate way.

As to L.'s sexual history, McKee testified she and L. talked about "private body parts," which L. referred to as "dick" and "pussy," and "things of a sexual nature." L. had in the past talked to her about things of a sexual nature that she had asked McKee not to tell L.'s sisters. Similarly, defendant told police when interviewed that L. told him about her past sexual encounters and from those conversations, defendant thought that L. "apparently . . . enjoys sex and wants it from wherever she can get it."

Given this evidence that defendant was allowed to introduce, defendant's Sixth Amendment right to present a defense was not impinged upon by the court's exclusion of the other, similar evidence.

IV

*There Were No Errors To Accumulate*

Defendant contends the cumulative effect of the errors he has alleged deprived him of due process of law and a fair trial, requiring reversal. As our above discussion illustrates, we have found no errors to accumulate.

V

*The Trial Court Did Not Violate Ex Post Facto Principles*

*When Imposing The $280 Restitution Fine*

The court imposed a $280 restitution fine as follows: "As the probation officer points out, by law I must impose a restitution fine pursuant to Penal Code [s]ection 1202.4. That fine would be two hundred and eighty dollars." The probation report had recommended that "[p]ursuant to Penal Code section 1202.4(b), the defendant shall pay a restitution fine of $300 for each felony conviction."

17

From 2009 through 2012, the years in which defendant committed the crimes, the restitution fine provided by former section 1202.4, subdivision (b)(1) ranged from minimums of $200 and $240, respectively, to a maximum of $10,000. (§ 1202.4, subd. (b)(1), as amended by Stats. 2009, ch. 454, § 1 & Stats. 2011, ch. 358, § 1.) In 2013, the year in which defendant was sentenced, the minimum had been increased to $280. (§ 1202.4, subd. (b)(1), as amended by Stats. 2012, ch. 873, § 1.5.)

Because the court imposed a $280 restitution fine, defendant contends the trial court intended to impose the minimum amount applicable which was "$200 or even $240," but the court incorrectly used the minimum applicable in 2013. This, according to defendant, resulted in a violation of the principle against ex post facto laws. We disagree.

"It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions." (*People v. Souza* (2012) 54 Cal.4th 90, 143.) Additionally, restitution fines are assessed based on the version of section 1202.4 in effect on the date the defendant committed his or her criminal offense or offenses, not the date upon which the defendant was sentenced. (*Souza*, at p. 143.) However, defendant reads too much into a record that is silent as to why the court chose the $280 figure. "[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.) Accordingly, the court was authorized to impose a $280 restitution fine, and we reject defendant's ex post facto contention.

18

DISPOSITION

The judgment is affirmed.

      ROBIE      , Acting P. J.

We concur:

      MAURO      , J.

      DUARTE      , J.