Filed 12/31/15  P. v. Johnson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>JERRY JOHNSON,<br><br>　　　　Defendant and Appellant. | A139060<br><br>(Solano County<br>Super. Ct. No. VCR213845) |

Jerry Johnson was convicted of rape of an incompetent person, with an enhancement for the infliction of great bodily injury.   He contends the legal test to determine whether a developmentally disabled individual is capable of consenting to sex is unconstitutional, that the evidence was insufficient to prove his  victim lacked the legal capacity to consent, and that his attorney was ineffective for not moving to strike the victim's mother's testimony about the victim's comprehension of sex, menstruation and pregnancy.  Johnson also contends the court miscalculated his restitution and probation revocation fines.  We agree that the fines were miscalculated.  Johnson's other arguments are meritless, so we modify the amount of the fines and affirm the judgment as so modified.

## BACKGROUND

### I. The Victim's Disabilities

The victim, born in July 1992, suffers from significant mental disabilities.   When she was three or four months old her mother noticed she "wasn't doing normal things, like crawling . . . or trying to sit up or anything."  She did not progress like her older

1

sisters as she grew older. She could not walk at age two and did not start to talk until she was about three. She attended special education programs from preschool through high school. The victim also has vision and hearing problems, weak wrists and a left foot that turns out when she walks.

Her mother testified that at age 18 the victim "can't do the same things that a normal 18-year-old could do. . . . She can't drive. She can't cook. She's not responsible." At the time of trial, when the victim was 20, she still lived with her mother. She could read numbers from one to ten but was unable to count change, do subtraction, tie her shoes, read, tell time, or understand measurements. She could not write a complete sentence and had difficulty adding three plus one. The victim testified that her older sister was 80 years old and that 80 is younger than 20. When given something to read, instead of reading the words, she spelled out the letters.

Her Mother did not explain the relationship between menstruation and pregnancy to the victim when she first started menstruating because she did not think the victim would understand. Neither her mother nor her older sister ever discussed " 'the birds and the bees' " with the victim or heard her express interest in boys or sex. Her older sister testified that she never discussed boys, sex or kissing with the victim because she did not think her sister would understand.

## II. The Crime

After the victim graduated from her high school's special education program she attended a transitional program in which she helped out as a teacher's aide in a class for developmentally disabled young children. Johnson taught the class and was the victim's supervisor. Around Christmas of 2010, her older sister and mother noticed calls from Johnson on the victim's cell phone. In January, the victim told her nephew she had a boyfriend.

That spring, her mother noticed that the victim's body was changing. In early June an obstetric examination confirmed she was approximately four months pregnant. Her mother contacted police and over the next days made two pretext calls to Johnson, both of which were recorded and played for the jury. During both calls Johnson avoided

2

expressly admitting he had sex with the victim, but he repeatedly assured her mother that he would take responsibility for the child and would contribute financially if a test showed him to be the father.

The victim gave birth by C-section around December 2011. DNA testing revealed a very high statistical probability that Johnson is the father.

The defense was that the victim's pregnancy resulted from a consensual sexual relationship and that the prosecution failed to prove she lacked the capacity to consent. The jury found Johnson guilty as charged and found true the great bodily injury allegation. He was sentenced to nine years in prison and ordered to pay restitution and parole revocation fines.

This timely appeal followed.

## DISCUSSION

### I. Evidence the Victim Was Legally Incapable of Consenting

Penal Code section 261, subdivision (a)[1] defines rape as "an act of sexual intercourse accomplished . . . under any of the following circumstances: [¶] (1) Where a person is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act . . . [T]he prosecuting attorney shall prove, as an element of the crime, that a mental disorder or developmental or physical disability rendered the alleged victim incapable of giving consent." For purposes of section 261, subdivision (a)(1), a person is legally incapable of consenting to intercourse when a mental disorder or developmental or physical disability renders him or her " 'unable to understand the act, its nature, and possible consequences.' " (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1416 (*Miranda*); see CALCRIM No. 1004.) Johnson contends the evidence was insufficient to prove that the victim's level of disability rendered her incapable of consenting. We disagree.

---

[1] Further statutory references are to the Penal Code.

3

"In considering an appellate challenge to the sufficiency of the evidence, state law requires this court to 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence[,] that is, evidence which is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Under the due process clause of the Fourteenth Amendment, an appellate court must 'determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' [Citation.] The reviewing court does not address whether it believes the evidence established guilt beyond a reasonable doubt. 'Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' " (*Miranda*, *supra*, 199 Cal.App.4th at pp. 1412–1413.)

We have carefully reviewed the evidence in this case, and it supports the jury's finding that the victim lacked the capacity to consent. We have described her mother's and sister's testimony about the victim's lifelong and profound developmental disabilities such as her early delays in walking and speech and, as an adult, her inability to read or write, do even simple math, count change, tie her own shoes, tell time, mix formula, take care of a baby or drive. The jurors learned that the victim attended special education programs from preschool through high school, and that she required constant supervision. The victim appeared uncertain and disengaged at her pregnancy examination, giving one-word answers and looking at her mother rather than speaking with the doctor .

The jurors also observed the victim's testimony. "In assessing whether a victim was capable of understanding the nature or consequences of sexual intercourse at the time

4

of an incident, 'the jury may evaluate, in addition to that person's testimony regarding his or her understanding, other relevant evidence such as the victim's demeanor, behavior, and clarity on the stand.' " (*Miranda, supra,* 199 Cal.App.4th at p. 1415.) " 'As explained by Judge Learned Hand, a witness's " ' "demeanor" '—is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale." ' " (*Id*. at p. 1414.)

That nexus of sense impressions was undoubtedly significant here. The victim's trial testimony consisted primarily of one or two word answers or, at the longest, abbreviated and frequently non-sequitur phrases. She did not know her mother's name. She did not know her sister's age and agreed when asked if her sister was 80. She said 80 was younger than 20. Asked if she knew what math is, the victim responded "Write it." She said her best subject was writing, but when the prosecutor asked what sorts of things she wrote she responded "A pencil" and "I can write my own name." Asked if she understood what "the truth" meant, the victim answered "The truth—when you lie—I mean, when you lie to somebody, don't believe them"

The victim gave nonsensical and childlike answers to questions about sex and reproduction. For example, when the prosecutor asked her what a C-section is, she answered "It's like—C-section is, like, when you put the—the—the IV thing in there." The following exchange occurred when the prosecutor asked whether there is anything different about the way little boys and little girls go to the bathroom: "A. Close the door when you go to the bathroom. [¶] Q. Okay. Do they both pee the same way? [¶] A. Yes. [¶] Q. Do they both pee out of the same part? [¶] A. No. [¶] Q. What's different? [¶] A. I don't know." The victim answered "yeah" when the prosecutor asked if she had heard the words "penis," "pee-pee," "breasts" or "boobs," but when asked what they mean she

5

repeated "Close the door when you go to the bathroom." She did not know how her baby got into her stomach or how she came out. She did not know how babies are made or what to do if she wanted to make another baby.

Defense counsel's questioning in the same area produced different answers, but the jury could also reasonably infer from them that the victim was incapable of comprehending the nature and possible consequences of intercourse. For example: "Q. You do know what sex is, don't you? [¶] A. Huh? [¶] Do you know what sex is? [¶] A. No. [¶] Q. Is that the truth or is that a lie? [¶] A. That's a lie. [¶] Q. Okay. So do you know what sex is? [¶] A. No. [¶] Q. Is that the truth or is that a lie? [¶] A. That's a lie. [¶] Q. I know it's embarrassing, . . . [¶] So, you do know what sex is? [¶] A. Kind of." When defense counsel asked the victim how the baby came to be in her stomach, she responded that "[t]he people took it," but when he followed up by asking if it was because she had sex with Johnson, she answered "yeah." When defense counsel asked what happened when she had her period, she answered, "Your stomach start growling."

The evidence that the victim was legally incapable of consenting to sex is also supported by the observations of the court and counsel. Defense counsel challenged her competency to testify, and the prosecutor acknowledged that "it was kind of a close call as to whether competency was established." At sentencing, the trial court said "it was clear . . . based on [the victim's] demeanor, her answers, her responses, that she was much like a child, in the Court's mind. . . . [C]learly, mentally, she was not a person who would be 19 years old. She's far below that and seemed quite childlike." The *Miranda* court reasoned under similar circumstances that "[w]hile these observations are not evidence in the sense that they were presented to the jury as proof of facts in dispute, they serve as an indication of what a juror could reasonably infer regarding [the victim's] capacity to consent based upon her demeanor as she testified. If the conclusions of the trial court and counsel were reasonably drawn from the evidence, the jurors could rationally reach the same conclusions based on their observations of the very same conduct." (*Miranda, supra*, 199 Cal.App.4th at p. 1416.) Here, as in *Miranda*, these

6

comments are consistent with and confirm substantial evidence that the victim lacked the capacity to consent.

Johnson's arguments do not persuade us otherwise. He maintains that the victim's demeanor at trial was insufficient to establish her level of cognition at the time of the offense: "Without any evidence regarding whether or not developmental disabilities such as [the victim's] become more pronounced over the course of time, the jury's observations of her conduct in the courtroom did not rise to 'evidence which is reasonable, credible, and of solid value' " sufficient to prove beyond a reasonable doubt that she lacked the capacity to consent two years earlier. We disagree. There was ample evidence that the victim suffered severe cognitive disabilities her entire life, and her mother gave specific testimony about her daughter's capabilities at age 18. Using their common sense and experience (see CALCRIM No. 226), the jury could reasonably infer from the evidence that her testimony and demeanor on the stand were indicative of her cognitive level two years earlier.

Johnson also suggests the evidence was insufficient to prove lack of capacity to consent because there was no expert testimony on the victim's cognitive disabilities or estimate from any witness of her equivalent intellectual age. No such testimony was necessary. "The existence of capacity to consent is a question of fact. [Citation.] A lay juror is able to assess the extent of a victim's mental disability. ' "The question whether a person possesses sufficient resources—intellectual, emotional, social, psychological—to determine whether to participate in sexual contact with another is an assessment within the ken of the average juror, who likely has made the determination at some point." [Citation.]' [Citation.] 'There is a nationwide consensus that expert testimony on this issue is not required.' " (*Miranda*, *supra*, 199 Cal.App.4th at pp. 1413–1414.) There was substantial evidence to support the jury's verdict.

## II. Lay Opinion Testimony

On direct examination, the prosecutor asked the victim's mother why she did not explain the connection between menstruation and pregnancy to her daughter when she first started menstruating. Her mother responded that the victim "wouldn't have

7

understood." Defense counsel objected that the testimony (which the witness repeated after the court overruled an initial objection) was inadmissible lay opinion. Following some colloquy, the court ruled—with defense counsel's concurrence—that the prosecutor could ask whether it appeared to the mother that her daughter understood something and why or why not, but could not elicit her opinion about what she actually understood or could have understood. Later, the prosecutor asked the victim's mother why she did not involve the victim in deciding whether to terminate the pregnancy. Her mother answered, "At the time [the victim] did not understand." The court sustained Johnson's objection that this was improper lay opinion.

Johnson now asserts the court should have stricken mother's initial comments that the victim "wouldn't have understood" the connection between menstruation and pregnancy, and that defense counsel's failure to move to strike all three statements about what the victim did not or would not have understood was ineffective assistance of counsel. We will not decide whether the court erred by not striking the testimony sua sponte or whether defense counsel was ineffective for failing to so move, because these statements could not have affected the verdict in light of the overwhelming evidence of the victim's profound cognitive deficits. Moreover, the court sustained objections to mother's testimony on "whether or not [the victim] would have actually understood" or "did not understand," and instructed the jury that "If I sustained an objection, you must ignore the question." Viewed in light of this record as a whole, the fact that the answers were not stricken caused no conceivable prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Strickland v. Washington* (1984) 466 U.S. 668, 697–698.)

### III. Constitutionality of Consent Requirement

Johnson argues section 261, subdivision (a)(1) violates the federal and state privacy and equal protection rights of disabled adults and their sexual partners, primarily because, unlike the definition of consent applicable to other rape offenses, the judicially developed test for a mentally disabled person's capacity to consent to sex requires that the individual be able to understand its possible consequences. "By employing a more stringent definition of 'consent' than that which applies to other sex crimes, section 261,

8

subdivision (a)(1) violates the constitutional right to equal protection. . . ." Johnson further argues that the "criminalization of consensual sex with a developmentally disabled person, unless that person understands the consequences of their actions in an abstract intellectual way," negates constitutional privacy rights. In response, the People assert these claims were forfeited by Johnson's failure to raise them in the trial court, that he lacks standing to assert the rights of developmentally disabled adults, and that he fails to identify the legal standards necessary to evaluate his arguments. On the merits, the People argue that for purposes of equal protection analysis Johnson is not entitled to the same treatment as individuals whose sexual partners are capable of consenting to sexual activity, and that the right of privacy does not extend to sexual conduct with individuals who lack that capability.

Preliminarily, we agree that Johnson's constitutional claims were forfeited. (*People v. Carpenter* (1997) 15 Cal.4th 312, 362, abrogated on another point in *People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) "As the United States Supreme Court recognized in United *States v. Olano* [1993] 507 U.S. [725,] 731, . . . ' "[n]o procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.)

Johnson's alternative claim that defense counsel's failure to raise these claims constituted ineffective assistance also fails. "To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant . . . ." (*People v. Kipp* (1998) 18 Cal.4th 349, 366.) Johnson can show neither. To establish a denial of equal protection, Johnson must show the challenged law treats two or more similarly situated groups differently. (*In re Eric J.* (1979) 25 Cal.3d 522, 530; *People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1383–1384 [equal protection analysis " 'will not proceed . . . if the groups at issue are not " 'similarly situated with

9

respect to the legitimate purpose of the law' " ' "].) Johnson contends section 261, subdivision (a)(1) denies him equal protection because "[n]on-disabled adults who wish to engage in sexual activity are not required by any rule of law to understand the consequences of the sexual act in the way that developmentally disabled are required to understand them." But there is a reasonable basis for distinguishing between individuals who have the required intellectual ability to consent and those who do not because, as Johnson acknowledges, the distinction is meant to "protect those who are profoundly mentally retarded or impaired from being exploited sexually because of their mental deficiency." " 'Obviously, it is the proper business of the state to stop sexual predators from taking advantage of developmentally disabled people.' " (*People v. Vukodinovich* (2015) 238 Cal.App.4th 166, 173.)

Johnson's privacy argument is also meritless. The same contention was recently rejected in *People v. Vukodinovich*, *supra*, 238 Cal.App.4th 166, which reasoned: "Were we to accept the alternative conclusion that defendant had a constitutional right to engage in sexual conduct with a person who had developmental disabilities and who lacked the legal capacity to consent, we would render the state incapable of protecting individuals with disabilities." (*Id*. at p. 173.) We agree. "The right to privacy . . . is not absolute, and governmental intervention in matters affecting an individual's right to privacy in sexual matters has been sanctioned in both criminal and civil law. [¶] . . . [T]he state has a fundamental right to enact laws which promote public health, welfare, and safety, even though such laws may invade the offender's right of privacy." (*Barbara A. v. John G.* (1983) 145 Cal.App.3d 369, 380.) It has properly done so, among other reasons, to proscribe sexual activity with persons whom society deems too young to be capable of consent (§ 261.5; see *New York v. Ferber* (1982) 458 U.S. 747, 756–757), who are incapable of comprehending the consequences of such activity due to intoxication (e.g., *People v. Smith* (2010) 191 Cal.App.4th 199, 204–205; CALCRIM No. 1002) and, as here, who are deprived of that ability by a mental disability. (*People v. Vukodinovich, supra,* 238 Cal.App.4th 166; *People v. Giardino* (2000) 82 Cal.App.4th 454, 466.)

10

Defense counsel was not required to assert meritless constitutional challenges to the states action to protect vulnerable disabled adults from sexual predation.

## IV. Restitution Fine

At sentencing, the trial court ordered Johnson to pay restitution and parole revocation fines of $2,520 each pursuant to sections 1202.4 and 1202.45. Johnson asserts, correctly, that the court used the wrong statutory multiplier to calculate the amount of the fines. The relevant portion of section 1202.4, subdivision (b) provides that the restitution fine "(1) . . . shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than two hundred forty dollars ($240) starting on January 1, 2012, two hundred eighty dollars ($280) starting on January 1, 2013, and three hundred dollars ($300) starting on January 1, 2014, and not more than ten thousand dollars . . . . [¶] (2) In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."

Here, the $2,520 recommended by probation and imposed by the court is the product of multiplying the $280 statutory minimum fine in effect at the time of Johnson's sentencing by his nine-year term. However, according to the charging document Johnson's offense occurred between February 1 and March 1, 2011. The multiplier then in effect was $200, not $280. (See former § 1202.4, subd.(b)(1); Stats. 2010, ch. 351 § 9.) Because restitution fines constitute punishment, the use of the later-enacted statutory multiplier violates the constitutional rule against ex post facto legislation and is cognizable on appeal despite the lack of a timely objection. (*People v. Souza* (2012) 54 Cal.4th 90, 143; *People v. Zito* (1992) 8 Cal.App.4th 736, 740–742.)

Both parties agree the appropriate remedy is to reduce the fine to $1,800 (nine years multiplied by $200). We agree. It is plain from the record that the trial court intended to use the minimum statutory fine as a multiplier under section 1202.4, subdivision (b), so there is no reason to remand for the court to clarify its intent. Section

1202.45 provides that the parole revocation fine must be assessed in the same amount as the restitution fine, so it, too, must be reduced to $1,800.

## DISPOSITION

The restitution and parole revocation fines are modified to $1,800 each.  As so modified, the judgment is affirmed.

 

 

_____
Siggins. J.

We concur:


_____
McGuiness, P.J.


_____
Pollak, J.

*People v. Johnson*, A139060

13